# KEYES ET AL. v. SCHOOL DISTRICT NO. 1, DENVER, COLORADO, ET AL.

No. 71–507.   Argued October 12, 1972—Decided June 21, 1973

Brennan, J., delivered the opinion of the Court, in which Douglas, Stewart, Marshall, and Blackmun, JJ., joined. Douglas, J., filed a separate opinion, *post*, p. 214. Burger, C. J., concurred in the result. Powell, J., filed an opinion concurring in part and dissenting in part, *post*, p. 217. Rehnquist, J., filed a dissenting opinion, *post*, p. 254. White, J., took no part in the decision of the case.

*James M. Nabrit III* and *Gordon G. Greiner* argued the cause for petitioners. With them on the brief were *Jack Greenberg, Charles Stephen Ralston, Norman J. Chachkin, Robert T. Connery,* and *Anthony G. Amsterdam.*

*William K. Ris* argued the cause for respondents. With him on the brief were *Thomas E. Creighton, Benjamin L. Craig,* and *Michael H. Jackson.**

*Briefs of *amici curiae* urging reversal were filed by *Melvin L. Wulf, Sanford Jay Rosen,* and *Edwin S. Kahn* for the American Civil Liberties Union et al.; by *Stephen J. Pollak, Richard M. Sharp, David Rubin, Larry F. Hobbs,* and *Leonard N. Waldbaum* for the National Education Association et al.; by *Arnold Forster, Paul Hartman, Paul S. Berger, Joseph B. Robison,* and *Samuel Rabinove* for the Anti-Defamation League of B'nai B'rith et al.; and by *Mario G. Obledo* and *Michael Mendelson* for the Mexican American Legal Defense and Educational Fund.

Briefs of *amici curiae* urging affirmance were filed by *Theodore L. Sendak,* Attorney General, *Wendell C. Hamacher,* Deputy Attorney General, and *William F. Harvey* for the State of Indiana; by

Mr. Justice Brennan delivered the opinion of the Court.

This school desegregation case concerns the Denver, Colorado, school system. That system has never been operated under a constitutional or statutory provision that mandated or permitted racial segregation in public education.[1] Rather, the gravamen of this action, brought in June 1969 in the District Court for the District of Colorado by parents of Denver schoolchildren, is that respondent School Board alone, by use of various techniques such as the manipulation of student attendance zones, schoolsite selection and a neighborhood school policy, created or maintained racially or ethnically (or both racially and ethnically) segregated schools throughout the school district, entitling petitioners to a decree directing desegregation of the entire school district.

The boundaries of the school district are coterminous with the boundaries of the city and county of Denver. There were in 1969, 119 schools[2] with 96,580 pupils

_Thomas A. Shannon, Donald R. Lincoln,_ and _Paul D. Engstrand_ for San Diego Unified School District; and by _Willis Hannawalt_ and _Vivian Hannawalt_ for Robert G. Nelson et al.

Briefs of _amici curiae_ were filed by _Solicitor General Griswold, Assistant Attorney General Norman, James P. Turner, Brian K. Landsberg,_ and _Thomas M. Keeling_ for the United States, and by _David I. Caplan_ for the Jewish Rights Council, Inc.

[1] To the contrary, Art. IX, § 8, of the Colorado Constitution expressly prohibits any "classification of pupils . . . on account of race or color." As early as 1927, the Colorado Supreme Court held that a Denver practice of excluding black students from school programs at Manual High School and Morey Junior High School violated state law. _Jones_ v. _Newlon,_ 81 Colo. 25, 253 P. 386.

[2] There were 92 elementary schools, 15 junior high schools, 2 junior-senior high schools, and 7 senior high schools. In addition, the Board operates an Opportunity School, a Metropolitan Youth Education Center, and an Aircraft Training Facility.

in the school system. In early 1969, the respondent School Board adopted three resolutions, Resolutions 1520, 1524, and 1531, designed to desegregate the schools in the Park Hill area in the northeast portion of the city. Following an election which produced a Board majority opposed to the resolutions, the resolutions were rescinded and replaced with a voluntary student transfer program. Petitioners then filed this action, requesting an injunction against the rescission of the resolutions and an order directing that the respondent School Board desegregate and afford equal educational opportunity "for the School District as a whole." App. 32a. The District Court found that by the construction of a new, relatively small elementary school, Barrett, in the middle of the Negro community west of Park Hill, by the gerrymandering of student attendance zones, by the use of so-called "optional zones," and by the excessive use of mobile classroom units, among other things, the respondent School Board had engaged over almost a decade after 1960 in an unconstitutional policy of deliberate racial segregation with respect to the Park Hill schools.[3] The court therefore ordered the Board to desegregate those schools through the implementation of the three rescinded resolutions. 303 F. Supp. 279 and 289 (1969).

Segregation in Denver schools is not limited, however, to the schools in the Park Hill area, and not satisfied with their success in obtaining relief for Park Hill, petitioners pressed their prayer that the District Court order desegregation of all segregated schools in the city of Denver, particularly the heavily segregated schools in the core city area.[4] But that court concluded that its

---

[3] The so-called "Park Hill schools" are Barrett, Stedman, Hallett, Smith, Philips, and Park Hill Elementary Schools; and Smiley Junior High School. East High School serves the area but is located outside of it. (See map following p. 214.)

[4] The so-called "core city schools" which are said to be segregated

finding of a purposeful and systematic program of racial segregation affecting thousands of students in the Park Hill area did not, in itself, impose on the School Board an affirmative duty to eliminate segregation throughout the school district. Instead, the court fractionated the district and held that petitioners had to make a fresh showing of *de jure* segregation in each area of the city for which they sought relief. Moreover, the District Court held that its finding of intentional segregation in Park Hill was not in any sense material to the question of segregative intent in other areas of the city. Under this restrictive approach, the District Court concluded that petitioners' evidence of intentionally discriminatory School Board action in areas of the district other than Park Hill was insufficient to "dictate the conclusion that this is *de jure* segregation which calls for an all-out effort to desegregate. It is more like *de facto* segregation, with respect to which the rule is that the court cannot order desegregation in order to provide a better balance." 313 F. Supp. 61, 73 (1970).

Nevertheless, the District Court went on to hold that the proofs established that the segregated core city schools were educationally inferior to the predominantly "white" or "Anglo" schools in other parts of the district—that is, "separate facilities . . . unequal in the quality of education provided." *Id.*, at 83. Thus, the court held that, under the doctrine of *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), respondent School Board constitutionally "must at a minimum . . . offer an equal educational opportunity," 313 F. Supp., at 83, and, therefore,

are Boulevard, Bryant-Webster, Columbine, Crofton, Ebert, Elmwood, Elyria, Fairmont, Fairview, Garden Place, Gilpin, Greenlee, Harrington, Mitchell, Smedley, Swansea, Whittier, Wyatt, and Wyman Elementary Schools; Baker, Cole, and Morey Junior High Schools; and East, West, and Manual High Schools. (See map following p. 214.)

although all-out desegregation "could not be decreed, . . . the only feasible and constitutionally acceptable program—the only program which furnishes anything approaching substantial equality—is a system of desegregation and integration which provides compensatory education in an integrated environment." 313 F. Supp. 90, 96 (1970). The District Court then formulated a varied remedial plan to that end which was incorporated in the Final Decree.[5]

Respondent School Board appealed, and petitioners cross-appealed, to the Court of Appeals for the Tenth Circuit. That court sustained the District Court's finding that the Board had engaged in an unconstitutional policy of deliberate racial segregation with respect to the Park Hill schools and affirmed the Final Decree in that respect. As to the core city schools, however, the Court of Appeals reversed the legal determination of the District Court that those schools were maintained in violation

---

[5] The first of the District Court's four opinions, 303 F. Supp. 279, was filed July 31, 1969, and granted petitioners' application for a preliminary injunction. The second opinion, 303 F. Supp. 289, was filed August 14, 1969, and made supplemental findings and conclusions. The third opinion, 313 F. Supp. 61, filed March 21, 1970, was the opinion on the merits. The fourth opinion, 313 F. Supp. 90, was on remedy and was filed May 21, 1970. The District Court filed an unreported opinion on October 19, 1971, in which relief was extended to Hallett and Stedman Elementary Schools which were found by the court in its July 31, 1969, opinion to be purposefully segregated but were not included within the scope of the three 1969 Board resolutions. The Court of Appeals filed five unreported opinions: on August 5, 1969, vacating preliminary injunctions; on August 27, 1969, staying preliminary injunction; on September 15, 1969, on motion to amend stay; on October 17, 1969, denying motions to dismiss; and on March 26, 1971, granting stay. MR. JUSTICE BRENNAN, on August 29, 1969, filed an opinion reinstating the preliminary injunction, 396 U. S. 1215, and on April 26, 1971, this Court entered a *per curiam* order vacating the Court of Appeals' stay, 402 U. S. 182.

of the Fourteenth Amendment because of the unequal educational opportunity afforded, and therefore set aside so much of the Final Decree as required desegregation and educational improvement programs for those schools. 445 F. 2d 990 (1971). In reaching that result, the Court of Appeals also disregarded respondent School Board's deliberate racial segregation policy respecting the Park Hill schools and accepted the District Court's finding that petitioners had not proved that respondent had a like policy addressed specifically to the core city schools.

We granted petitioners' petition for certiorari to review the Court of Appeals' judgment insofar as it reversed that part of the District Court's Final Decree as pertained to the core city schools. 404 U. S. 1036 (1972). The judgment of the Court of Appeals in that respect is modified to vacate instead of reverse the Final Decree. The respondent School Board has cross-petitioned for certiorari to review the judgment of the Court of Appeals insofar as it affirmed that part of the District Court's Final Decree as pertained to the Park Hill schools. Docket No. 71–572, *School District No. 1* v. *Keyes.* The cross-petition is denied.

I

Before turning to the primary question we decide today, a word must be said about the District Court's method of defining a "segregated" school. Denver is a tri-ethnic, as distinguished from a bi-racial, community. The overall racial and ethnic composition of the Denver public schools is 66% Anglo, 14% Negro, and 20% Hispano.[6] The District Court, in assessing the question of

---

[6] The parties have used the terms "Anglo," "Negro," and "Hispano" throughout the record. We shall therefore use those terms. "Hispano" is the term used by the Colorado Department of Education to refer to a person of Spanish, Mexican, or Cuban heritage. Colorado Department of Education, Human Relations in Colorado,

*de jure* segregation in the core city schools, preliminarily resolved that Negroes and Hispanos should not be placed in the same category to establish the segregated character of a school. 313 F. Supp., at 69. Later, in determining the schools that were likely to produce an inferior educational opportunity, the court concluded that a school would be considered inferior only if it had "a concentration of either Negro or Hispano students in the general area of 70 to 75 percent." *Id.*, at 77. We intimate no opinion whether the District Court's 70%-to-75% requirement was correct. The District Court used those figures to signify educationally inferior schools, and there is no suggestion in the record that those same figures were or would be used to define a "segregated" school in the *de jure* context. What is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of faculty and staff and the community and administration attitudes toward the school, must be taken into consideration. The District Court has recognized these specific factors as elements of the definition of a "segregated" school, *id.*, at 74, and we may therefore infer that the court will consider them again on remand.

---

A Historical Record 203 (1968). In the Southwest, the "Hispanos" are more commonly referred to as "Chicanos" or "Mexican-Americans."

The more specific racial and ethnic composition of the Denver public schools is as follows:

| Pupils | Anglo | | Negro | | Hispano | |
|---|---|---|---|---|---|---|
| | No. | % | No. | % | No. | % |
| Elementary | 33,719 | 61.8 | 8,297 | 15.2 | 12,570 | 23.0 |
| Junior High | 14,848 | 68.7 | 2,893 | 13.4 | 3,858 | 17.9 |
| Senior High | 14,852 | 72.8 | 2,442 | 12.0 | 3,101 | 15.2 |
| Total | 63,419 | 65.7 | 13,632 | 14.1 | 19,529 | 20.2 |

We conclude, however, that the District Court erred in separating Negroes and Hispanos for purposes of defining a "segregated" school. We have held that Hispanos constitute an identifiable class for purposes of the Fourteenth Amendment. *Hernandez* v. *Texas,* 347 U. S. 475 (1954). See also *United States* v. *Texas Education Agency,* 467 F. 2d 848 (CA5 1972) (*en banc*); *Cisneros* v. *Corpus Christi Independent School District,* 467 F. 2d 142 (CA5 1972) (*en banc*); *Alvarado* v. *El Paso Independent School District,* 445 F. 2d 1011 (CA5 1971); *Soria* v. *Oxnard School District,* 328 F. Supp. 155 (CD Cal. 1971); *Romero* v. *Weakley,* 226 F. 2d 399 (CA9 1955). Indeed, the District Court recognized this in classifying predominantly Hispano schools as "segregated" schools in their own right. But there is also much evidence that in the Southwest Hispanos and Negroes have a great many things in common. The United States Commission on Civil Rights has recently published two Reports on Hispano education in the Southwest.[7] Focusing on students in the States of Arizona, California, Colorado, New Mexico, and Texas, the Commission concluded that Hispanos suffer from the same educational inequities as Negroes and American Indians.[8] In fact, the District Court itself recognized that "[o]ne of the things which the Hispano has in common with the Negro is economic and cultural deprivation

---

[7] United States Commission on Civil Rights, Mexican American Education Study, Report 1, Ethnic Isolation of Mexican Americans in the Public Schools of the Southwest (Apr. 1971); United States Commission on Civil Rights, Mexican American Educational Series, Report 2, The Unfinished Education (Oct. 1971).

[8] The Commission's second Report, on p. 41, summarizes its findings:

"The basic finding of this report is that minority students in the Southwest—Mexican Americans, blacks, American Indians—do not obtain the benefits of public education at a rate equal to that of their Anglo classmates."

and discrimination." 313 F. Supp., at 69. This is agreement that, though of different origins, Negroes and Hispanos in Denver suffer identical discrimination in treatment when compared with the treatment afforded Anglo students. In that circumstance, we think petitioners are entitled to have schools with a combined predominance of Negroes and Hispanos included in the category of "segregated" schools.

## II

In our view, the only other question that requires our decision at this time is that subsumed in Question 2 of the questions presented by petitioners, namely, whether the District Court and the Court of Appeals applied an incorrect legal standard in addressing petitioners' contention that respondent School Board engaged in an unconstitutional policy of deliberate segregation in the core city schools. Our conclusion is that those courts did not apply the correct standard in addressing that contention.[9]

Petitioners apparently concede for the purposes of this case that in the case of a school system like Denver's, where no statutory dual system has ever existed, plaintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action. Petitioners proved that for almost a decade after 1960 respondent School Board had engaged in an unconstitutional policy of deliberate racial segregation in the Park Hill schools. Indeed, the District Court found that "[b]etween 1960 and 1969 the Board's policies

---

[9] Our Brother REHNQUIST argues in dissent that the Court somehow transgresses the "two-court" rule. *Post,* at 264. But at this stage, we have no occasion to review the factual findings concurred in by the two courts below. Cf. *Neil* v. *Biggers,* 409 U. S. 188 (1972). We address only the question whether those courts applied the correct legal standard in deciding the case as it affects the core city schools.

with respect to these northeast Denver schools show an undeviating purpose to isolate Negro students" in segregated schools "while preserving the Anglo character of [other] schools." 303 F. Supp., at 294. This finding did not relate to an insubstantial or trivial fragment of the school system. On the contrary, respondent School Board was found guilty of following a deliberate segregation policy at schools attended, in 1969, by 37.69% of Denver's total Negro school population, including one-fourth of the Negro elementary pupils, over two-thirds of the Negro junior high pupils, and over two-fifths of the Negro high school pupils.[10] In addition,

---

[10] The Board was found guilty of intentionally segregative acts of one kind or another with respect to the schools listed below. (As to Cole and East, the conclusion rests on the rescission of the resolutions.)

PUPILS 1968–1969

|                      | Anglo | Negro | Hispano | Total |
|----------------------|-------|-------|---------|-------|
| Barrett              | 1     | 410   | 12      | 423   |
| Stedman              | 27    | 634   | 25      | 686   |
| Hallett              | 76    | 634   | 41      | 751   |
| Park Hill            | 684   | 223   | 56      | 963   |
| Philips              | 307   | 203   | 45      | 555   |
| Smiley Jr. High      | 360   | 1,112 | 74      | 1,546 |
| Cole Jr. High        | 46    | 884   | 289     | 1,219 |
| East High            | 1,409 | 1,039 | 175     | 2,623 |
| Subtotal Elementary  | 1,095 | 2,104 | 179     | 3,378 |
| Subtotal Jr. High    | 406   | 1,996 | 363     | 2,765 |
| Subtotal Sr. High    | 1,409 | 1,039 | 175     | 2,623 |
| Total                | 2,910 | 5,139 | 717     | 8,766 |

The total Negro school enrollment in 1968 was:
Elementary      8,297
Junior High     2,893
Senior High     2,442

Thus, the above-mentioned schools included:
Elementary   25.36% of all Negro elementary pupils
Junior High   68.99% of all Negro junior high pupils
Senior High   42.55% of all Negro senior high pupils
   Total       37.69% of all Negro pupils

there was uncontroverted evidence that teachers and staff had for years been assigned on the basis of a minority teacher to a minority school throughout the school system. Respondent argues, however, that a finding of state-imposed segregation as to a substantial portion of the school system can be viewed in isolation from the rest of the district, and that even if state-imposed segregation does exist in a substantial part of the Denver school system, it does not follow that the District Court could predicate on that fact a finding that the entire school system is a dual system. We do not agree. We have never suggested that plaintiffs in school desegregation cases must bear the burden of proving the elements of *de jure* segregation as to each and every school or each and every student within the school system. Rather, we have held that where plaintiffs prove that a current condition of segregated schooling exists within a school district where a dual system was compelled or authorized by statute at the time of our decision in *Brown* v. *Board of Education,* 347 U. S. 483 (1954) (*Brown I*), the State automatically assumes an affirmative duty "to effectuate a transition to a racially nondiscriminatory school system," *Brown* v. *Board of Education,* 349 U. S. 294, 301 (1955) (*Brown II*), see also *Green* v. *County School Board,* 391 U. S. 430, 437–438 (1968), that is, to eliminate from the public schools within their school system "all vestiges of state-imposed segregation." *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, 15 (1971).[11]

---

[11] Our Brother REHNQUIST argues in dissent that *Brown* v. *Board of Education* did not impose an "affirmative duty to integrate" the schools of a dual school system but was only a "prohibition against discrimination" "in the sense that the assignment of a child to a particular school is not made to depend on his race . . . ." *Infra,* at 258. That is the interpretation of *Brown* expressed 18 years ago by a three-judge court in *Briggs* v. *Elliott,* 132 F. Supp. 776, 777

This is not a case, however, where a statutory dual system has ever existed. Nevertheless, where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system. Several considerations support this conclusion. First, it is obvious that a practice of concentrating Negroes in certain schools by structuring attendance zones or designating "feeder" schools on the basis of race has the reciprocal effect of keeping other nearby schools predominantly white.[12] Similarly, the practice of building a school—such as the Barrett Elementary School in this case—to a certain size and in a certain location, "with conscious knowledge that it would

---

(1955): "The Constitution, in other words, does not require integration. It merely forbids discrimination." But *Green* v. *County School Board*, 391 U. S. 430, 437–438 (1968), rejected that interpretation insofar as *Green* expressly held that "School boards . . . operating state-compelled dual systems were nevertheless clearly charged [by *Brown II*] with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green* remains the governing principle. *Alexander* v. *Holmes County Board of Education*, 396 U. S: 19 (1969); *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 15 (1971). See also *Kelley* v. *Metropolitan County Board of Education*, 317 F. Supp. 980, 984 (1970).

[12] As a former School Board President who testified for the respondents put it: "Once you change the boundary of any one school, it is affecting all the schools . . . ." Testimony of Mrs. Lois Heath Johnson on cross-examination. App. 951a–952a.

Similarly, Judge Wisdom has recently stated:

"Infection at one school infects all schools. To take the most simple example, in a two school system, all blacks at one school means all or almost all whites at the other." *United States* v. *Texas Education Agency*, 467 F. 2d 848, 888 (CA5 1972).

be a segregated school," 303 F. Supp., at 285, has a substantial reciprocal effect on the racial composition of other nearby schools. So also, the use of mobile classrooms, the drafting of student transfer policies, the transportation of students, and the assignment of faculty and staff, on racially identifiable bases, have the clear effect of earmarking schools according to their racial composition, and this, in turn, together with the elements of student assignment and school construction, may have a profound reciprocal effect on the racial composition of residential neighborhoods within a metropolitan area, thereby causing further racial concentration within the schools. We recognized this in *Swann* when we said:

"They [school authorities] must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.

"In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since *Brown,* closed schools

which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning.' Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with 'neighborhood zoning,' further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy." 402 U. S., at 20–21.

In short, common sense dictates the conclusion that racially inspired school board actions have an impact beyond the particular schools that are the subjects of those actions. This is not to say, of course, that there can never be a case in which the geographical structure of, or the natural boundaries within, a school district may have the effect of dividing the district into separate, identifiable and unrelated units. Such a determination is essentially a question of fact to be resolved by the trial court in the first instance, but such cases must be rare. In the absence of such a determination, proof of state-imposed segregation in a substantial portion of the district will suffice to support a finding by the trial court of the existence of a dual system. Of course, where that finding is made, as in cases involving statutory dual systems, the school authorities have an affirmative duty "to effectuate a transition to a racially nondiscriminatory school system." *Brown II, supra,* at 301.

On remand, therefore, the District Court should decide in the first instance whether respondent School Board's deliberate racial segregation policy with respect to the Park Hill schools constitutes the entire Denver school system a dual school system. We observe that on the record now before us there is indication that Denver is not a school district which might be divided into separate, identifiable and unrelated units. The District Court stated, in its summary of findings as to the Park Hill schools, that there was "a high degree of interrelationship among these schools, so that any action by the Board affecting the racial composition of one would almost certainly have an effect on the others." 303 F. Supp., at 294. And there was cogent evidence that the ultimate effect of the Board's actions in Park Hill was not limited to that area: the three 1969 resolutions designed to desegregate the Park Hill schools changed the attendance patterns of at least 29 schools attended by almost one-third of the pupils in the Denver school system.[13] This suggests that the official segregation in Park Hill affected the racial composition of schools throughout the district.

On the other hand, although the District Court did not state this, or indeed any, reason why the Park Hill finding was disregarded when attention was turned to the core city schools—beyond saying that the Park Hill and core city areas were in its view "different"— the areas, although adjacent to each other, are separated by Colorado Boulevard, a six-lane highway. From the record, it is difficult to assess the actual significance of Colorado Boulevard to the Denver school system. The Boulevard runs the length of the school district, but at

---

[13] See the chart in 445 F. 2d, at 1008–1009, which indicates that 31,767 pupils attended the schools affected by the resolutions.

least two elementary schools, Teller and Steck, have attendance zones which cross the Boulevard. Moreover, the District Court, although referring to the Boulevard as "a natural dividing line," 303 F. Supp., at 282, did not feel constrained to limit its consideration of *de jure* segregation in the Park Hill area to those schools east of the Boulevard. The court found that by building Barrett Elementary School west of the Boulevard and by establishing the Boulevard as the eastern boundary of the Barrett attendance zone, the Board was able to maintain for a number of years the Anglo character of the Park Hill schools. This suggests that Colorado Boulevard is not to be regarded as the type of barrier that of itself could confine the impact of the Board's actions to an identifiable area of the school district, perhaps because a major highway is generally not such an effective buffer between adjoining areas. Cf. *Davis* v. *Board of School Commissioners of Mobile County,* 402 U. S. 33 (1971). But this is a factual question for resolution by the District Court on remand. In any event, inquiry whether the District Court and the Court of Appeals applied the correct legal standards in addressing petitioners' contention of deliberate segregation in the core city schools is not at an end even if it be true that Park Hill may be separated from the rest of the Denver school district as a separate, identifiable, and unrelated unit.

## III

The District Court proceeded on the premise that the finding as to the Park Hill schools was irrelevant to the consideration of the rest of the district, and began its examination of the core city schools by requiring that petitioners prove all of the essential elements of *de jure* segregation—that is, stated simply, a current condition of segregation resulting from intentional state action

directed specifically to the core city schools.[14]   The segregated character of the core city schools could not be and is not denied.   Petitioners' proof showed that at the time of trial 22 of the schools in the core city area were less than 30% in Anglo enrollment and 11 of the schools were less than 10% Anglo.[15]   Petitioners also introduced substantial evidence demonstrating the existence of a disproportionate racial and ethnic composition of faculty and staff at these schools.

On the question of segregative intent, petitioners presented evidence tending to show that the Board, through its actions over a period of years, intentionally created and maintained the segregated character of the core city schools.   Respondents countered this evidence by arguing that the segregation in these schools is the result of a racially neutral "neighborhood school policy"

---

[14] Our Brother REHNQUIST argues in dissent that the District Court did take the Park Hill finding into account in addressing the question of alleged *de jure* segregation of the core city schools. *Post*, at 262.   He cites the following excerpt from a footnote to the District Court's opinion of March 21, 1970, 313 F. Supp., at 74–75, n. 18: "Although past discriminatory acts may not be a substantial factor contributing to present segregation, they may nevertheless be probative on the issue of the segregative purpose of other discriminatory acts which are in fact a substantial factor in causing a present segregated situation."   But our Brother REHNQUIST omits the rest of the footnote: "Thus, in part I of this opinion, we discussed the building of Barrett, boundary changes and the use of mobile units as they relate to the purpose for the rescission of Resolutions 1520, 1524 and 1531."   Obviously, the District Court was carefully limiting the comment to the consideration being given past discriminatory acts *affecting the Park Hill schools* in assessing the causes of current segregation of *those schools*.

[15] In addition to these 22 schools, see 313 F. Supp., at 78, two more schools, Elyria and Smedley Elementary Schools, became less than 30% Anglo after the District Court's decision on the merits. These two schools were thus included in the list of segregated schools. 313 F. Supp., at 92.

and that the acts of which petitioners complain are explicable within the bounds of that policy. Accepting the School Board's explanation, the District Court and the Court of Appeals agreed that a finding of *de jure* segregation as to the core city schools was not permissible since petitioners had failed to prove "(1) a racially discriminatory purpose and (2) a causal relationship between the acts complained of and the racial imbalance admittedly existing in those schools." 445 F. 2d, at 1006. This assessment of petitioners' proof was clearly incorrect.

Although petitioners had already proved the existence of intentional school segregation in the Park Hill schools, this crucial finding was totally ignored when attention turned to the core city schools. Plainly, a finding of intentional segregation as to a portion of a school system is not devoid of probative value in assessing the school authorities' intent with respect to other parts of the same school system. On the contrary, where, as here, the case involves one school board, a finding of intentional segregation on its part in one portion of a school system is highly relevant to the issue of the board's intent with respect to other segregated schools in the system. This is merely an application of the well-settled evidentiary principle that "the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent." 2 J. Wigmore, Evidence 200 (3d ed. 1940). "Evidence that similar and related offenses were committed . . . tend[s] to show a consistent pattern of conduct highly relevant to the issue of intent." *Nye & Nissen* v. *United States,* 336 U. S. 613, 618 (1949). Similarly, a finding of illicit intent as to a meaningful portion of the item under consideration has substantial probative value on the question of illicit intent as to

the remainder. See, for example, the cases cited in 2 Wigmore, *supra,* at 301–302. And "[t]he foregoing principles are equally as applicable to civil cases as to criminal cases . . . ." *Id.,* at 300. See also C. McCormick, Evidence 329 (1954).

Applying these principles in the special context of school desegregation cases, we hold that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions. This is true even if it is determined that different areas of the school district should be viewed independently of each other because, even in that situation, there is high probability that where school authorities have effectuated an intentionally segregative policy in a meaningful portion of the school system, similar impermissible considerations have motivated their actions in other areas of the system. We emphasize that the differentiating factor between *de jure* segregation and so-called *de facto* segregation to which we referred in *Swann* [16] is *purpose* or *intent* to segregate. Where school authorities have been found to have practiced purposeful segregation in part of a school system, they may be expected to oppose system-wide desegregation, as did the respondents in this case, on the ground that their purposefully segregative actions were isolated and individual events, thus leaving plaintiffs with the burden of proving otherwise. But at that point where an intentionally segrega-

---

[16] 402 U. S. 1, 17–18 (1971).

tive policy is practiced in a meaningful or significant segment of a school system, as in this case, the school authorities cannot be heard to argue that plaintiffs have proved only "isolated and individual" unlawfully segregative actions. In that circumstance, it is both fair and reasonable to require that the school authorities bear the burden of showing that their actions as to other segregated schools within the system were not also motivated by segregative intent.

This burden-shifting principle is not new or novel. There are no hard-and-fast standards governing the allocation of the burden of proof in every situation. The issue, rather, "is merely a question of policy and fairness based on experience in the different situations." 9 J. Wigmore, Evidence § 2486, at 275 (3d ed. 1940). In the context of racial segregation in public education, the courts, including this Court, have recognized a variety of situations in which "fairness" and "policy" require state authorities to bear the burden of explaining actions or conditions which appear to be racially motivated. Thus, in *Swann,* 402 U. S., at 18, we observed that in a system with a "history of segregation," "where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." Again, in a school system with a history of segregation, the discharge of a disproportionately large number of Negro teachers incident to desegregation "thrust[s] upon the School Board the burden of justifying its conduct by clear and convincing evidence." *Chambers* v. *Hendersonville City Board of Education,* 364 F. 2d 189, 192 (CA4 1966) (en banc). See also *United States* v. *Jefferson County Board of Education,* 372 F.

2d 836, 887–888 (CA5 1966), aff'd *en banc,* 380 F. 2d 385 (1967); *North Carolina Teachers Assn.* v. *Asheboro City Board of Education,* 393 F. 2d 736, 743 (CA4 1968) (*en banc*); *Williams* v. *Kimbrough,* 295 F. Supp. 578, 585 (WD La. 1969); *Bonner* v. *Texas City Independent School District,* 305 F. Supp. 600, 621 (SD Tex. 1969). Nor is this burden-shifting principle limited to former statutory dual systems. See, *e. g., Davis* v. *School District of the City of Pontiac,* 309 F. Supp. 734, 743, 744 (ED Mich. 1970), aff'd, 443 F. 2d 573 (CA6 1971); *United States* v. *School District No. 151,* 301 F. Supp. 201, 228 (ND Ill. 1969), modified on other grounds, 432 F. 2d 1147 (CA7 1970). Indeed, to say that a system has a "history of segregation" is merely to say that a pattern of intentional segregation has been established in the past. Thus, be it a statutory dual system or an allegedly unitary system where a meaningful portion of the system is found to be intentionally segregated, the existence of subsequent or other segregated schooling within the same system justifies a rule imposing on the school authorities the burden of proving that this segregated schooling is not also the result of intentionally segregative acts.

In discharging that burden, it is not enough, of course, that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions. Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions. The courts below attributed much significance to the fact that many of the Board's actions in the core city area antedated our decision in *Brown.* We reject any suggestion that remoteness in time has any relevance to the issue of intent. If the actions of school authorities were to any degree motivated by segregative intent and the segregation resulting from those actions continues to exist, the fact of remote-

ness in time certainly does not make those actions any less "intentional."

This is not to say, however, that the prima facie case may not be met by evidence supporting a finding that a lesser degree of segregated schooling in the core city area would not have resulted even if the Board had not acted as it did. In *Swann,* we suggested that at some point in time the relationship between past segregative acts and present segregation may become so attenuated as to be incapable of supporting a finding of *de jure* segregation warranting judicial intervention. 402 U. S., at 31–32. See also *Hobson* v. *Hansen,* 269 F. Supp. 401, 495 (DC 1967), aff'd *sub nom. Smuck* v. *Hobson,* 132 U. S. App. D. C. 372, 408 F. 2d 175 (1969).[17] We made it clear, however, that a connection between past segregative acts and present segregation may be present even when not apparent and that close examination is required before concluding that the connection does not exist. Intentional school segregation in the past may have been a factor in creating a natural environment for the growth of further segregation. Thus, if respondent School Board cannot disprove segregative intent, it can rebut the prima facie case only by showing that its past segregative acts did not create or contribute to the current segregated condition of the core city schools.

The respondent School Board invoked at trial its "neighborhood school policy" as explaining racial and ethnic concentrations within the core city schools, arguing

---

[17] It may be that the District Court and Court of Appeals were applying this test in holding that petitioners had failed to prove that the Board's actions "caused" the current condition of segregation in the core city schools. But, if so, certainly plaintiffs in a school desegregation case are not required to prove "cause" in the sense of "non-attenuation." That is a factor which becomes relevant only after past intentional actions resulting in segregation have been established. At that stage, the burden becomes the school authorities' to show that the current segregation is in no way the result of those past segregative actions.

that since the core city area population had long been Negro and Hispano, the concentrations were necessarily the result of residential patterns and not of purposefully segregative policies. We have no occasion to consider in this case whether a "neighborhood school policy" of itself will justify racial or ethnic concentrations in the absence of a finding that school authorities have committed acts constituting *de jure* segregation. It is enough that we hold that the mere assertion of such a policy is not dispositive where, as in this case, the school authorities have been found to have practiced *de jure* segregation in a meaningful portion of the school system by techniques that indicate that the "neighborhood school" concept has not been maintained free of manipulation. Our observations in *Swann, supra,* at 28, are particularly instructive on this score:

> "Absent a constitutional violation there would be no basis for judicially ordering assignment of students on a racial basis. All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. . . .
>
> ". . . 'Racially neutral' assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a 'loaded game board,' affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral."

Thus, respondent School Board having been found to have practiced deliberate racial segregation in schools attended by over one-third of the Negro school population, that crucial finding establishes a prima facie case of intentional segregation in the core city schools. In such case, respondent's neighborhood school policy is not to be determinative "simply because it appears to be neutral."

IV

In summary, the District Court on remand, *first,* will afford respondent School Board the opportunity to prove its contention that the Park Hill area is a separate, identifiable and unrelated section of the school district that should be treated as isolated from the rest of the district. If respondent School Board fails to prove that contention, the District Court, *second,* will determine whether respondent School Board's conduct over almost a decade after 1960 in carrying out a policy of deliberate racial segregation in the Park Hill schools constitutes the entire school system a dual school system. If the District Court determines that the Denver school system is a dual school system, respondent School Board has the affirmative duty to desegregate the entire system "root and branch." *Green* v. *County School Board,* 391 U. S., at 438. If the District Court determines, however, that the Denver school system is not a dual school system by reason of the Board's actions in Park Hill, the court, *third,* will afford respondent School Board the opportunity to rebut petitioners' prima facie case of intentional segregation in the core city schools raised by the finding of intentional segregation in the Park Hill schools. There, the Board's burden is to show that its policies and practices with respect to schoolsite location, school size, school renovations and additions, student-attendance zones, student assignment and transfer options, mobile classroom units, transportation of students, as-

signment of faculty and staff, etc., considered together and premised on the Board's so-called "neighborhood school" concept, either were not taken in effectuation of a policy to create or maintain segregation in the core city schools, or, if unsuccessful in that effort, were not factors in causing the existing condition of segregation in these schools. Considerations of "fairness" and "policy" demand no less in light of the Board's intentionally segregative actions. If respondent Board fails to rebut petitioners' prima facie case, the District Court must, as in the case of Park Hill, decree all-out desegregation of the core city schools.

The judgment of the Court of Appeals is modified to vacate instead of reverse the parts of the Final Decree that concern the core city schools, and the case is remanded to the District Court for further proceedings consistent with this opinion.[18]

*It is so ordered.*

[Map of elementary school boundaries follows this page.]

MR. CHIEF JUSTICE BURGER concurs in the result.

MR. JUSTICE WHITE took no part in the decision of this case.

MR. JUSTICE DOUGLAS.

While I join the opinion of the Court, I agree with my Brother POWELL that there is, for the purposes of the

---

[18] We therefore do not reach, and intimate no view upon, the merits of the holding of the District Court, premised upon its erroneous finding that the situation "is more like *de facto* segregation," 313 F. Supp., at 73, that nevertheless, although all-out desegregation "could not be decreed . . . the only feasible and constitutionally acceptable program . . . is a system of desegregation and integration which provides compensatory education in an integrated environment." *Id.*, at 96.

ELEMENTARY SCHOOL
ATTENDANCE AREAS

UNDER 10 PERCENT ANGLO
10 TO 20 PERCENT ANGLO
PREDOMINANTLY HISPANO ●

SCHOOL DISTRICT NO. 1
IN THE CITY AND COUNTY OF DENVER
AND STATE OF COLORADO

ELEMENTARY SCHOOL
BOUNDARIES

SEPTEMBER, 1967

SCALE: 2.7 INCHES=1 MILE

BOUNDARY CITY AND
COUNTY OF DENVER

SCHOOL BOUNDARIES

BUILDING AND SITE LOCATIONS

SPECIAL ASSIGNED AREAS

APPROVED: Howard L. Johnson

Equal Protection Clause of the Fourteenth Amendment as applied to the school cases, no difference between *de facto* and *de jure* segregation. The school board is a state agency and the lines that it draws, the locations it selects for school sites, the allocation it makes of students, the budgets it prepares are state action for Fourteenth Amendment purposes.

As Judge Wisdom cogently stated in *United States* v. *Texas Education Agency,* 467 F. 2d 848, segregated schools are often created, not by dual school systems decreed by the legislature, but by the administration of school districts by school boards. Each is state action within the meaning of the Fourteenth Amendment. "Here school authorities assigned students, faculty, and professional staff; employed faculty and staff; chose sites for schools; constructed new schools and renovated old ones; and drew attendance zone lines. The natural and foreseeable consequence of these actions was segregation of Mexican-Americans. Affirmative action to the contrary would have resulted in desegregation. When school authorities, by their actions, contribute to segregation in education, whether by causing additional segregation or maintaining existing segregation, they deny to the students equal protection of the laws.

"We need not define the quantity of state participation which is a prerequisite to a finding of constitutional violation. Like the legal concepts of 'the reasonable man,' 'due care,' 'causation,' 'preponderance of the evidence,' and 'beyond a reasonable doubt,' the necessary degree of state involvement is incapable of precise definition and must be defined on a case-by-case basis. Suffice it to say that school authorities here played a significant role in causing or perpetuating unequal educational opportunities for Mexican-Americans, and did so on a system-wide basis." *Id.,* at 863–864.

These latter acts are often said to create *de facto* as contrasted with *de jure* segregation. But, as Judge Wisdom observes, each is but another form of *de jure* segregation.

I think it is time to state that there is no constitutional difference between *de jure* and *de facto* segregation, for each is the product of state actions or policies. If a "neighborhood" or "geographical" unit has been created along racial lines by reason of the play of restrictive covenants that restrict certain areas to "the elite," leaving the "undesirables" to move elsewhere, there is state action in the constitutional sense because the force of law is placed behind those covenants.

There is state action in the constitutional sense when public funds are dispersed by urban development agencies to build racial ghettoes.

Where the school district is racially mixed and the races are segregated in separate schools, where black teachers are assigned almost exclusively to black schools, where the school board closed existing schools located in fringe areas and built new schools in black areas and in distant white areas, where the school board continued the "neighborhood" school policy at the elementary level, these actions constitute state action. They are of a kind quite distinct from the classical *de jure* type of school segregation. Yet calling them *de facto* is a misnomer, as they are only more subtle types of state action that create or maintain a wholly or partially segregated school system. See *Kelly* v. *Guinn*, 456 F. 2d 100.

When a State forces, aids, or abets, or helps create a racial "neighborhood," it is a travesty of justice to treat that neighborhood as sacrosanct in the sense that its creation is free from the taint of state action.

The Constitution and Bill of Rights have described the design of a pluralistic society. The individual has the

right to seek such companions as he desires. But a State is barred from creating by one device or another ghettoes that determine the school one is compelled to attend.

MR. JUSTICE POWELL concurring in part and dissenting in part.

I concur in the remand of this case for further proceedings in the District Court, but on grounds that differ from those relied upon by the Court.

This is the first school desegregation case to reach this Court which involves a major city outside the South. It comes from Denver, Colorado, a city and a State which have not operated public schools under constitutional or statutory provisions which mandated or permitted racial segregation.[1] Nor has it been argued that any other legislative actions (such as zoning and housing laws) contributed to the segregation which is at issue.[2] The Court has inquired only to what extent the Denver public school authorities may have contributed to the school segregation which is acknowledged to exist in Denver.

The predominantly minority schools are located in two areas of the city referred to as Park Hill and the core city area. The District Court considered that a school

[1] Article IX, § 8, of the Colorado Constitution has expressly prohibited any "classification of pupils . . . on account of race or color."

[2] See, e. g., *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 23 (1971):

"We do not reach . . . the question whether a showing that school segregation is a consequence of other types of state action, without any discriminatory action by the school authorities, is a constitutional violation requiring remedial action by a school desegregation decree." The term "state action," as used herein, thus refers to actions of the appropriate public school authorities.

with a concentration of 70% to 75% "Negro or Hispano students" was identifiable as a segregated school. 313 F. Supp. 61, 77. Wherever one may draw this line, it is undisputed that most of the schools in these two areas are in fact heavily segregated in the sense that their student bodies are overwhelmingly composed of non-Anglo children. The city-wide school mix in Denver is 66% Anglo, 14% Negro, and 20% Hispano. In areas of the city where the Anglo population largely resides, the schools are predominantly Anglo, if not entirely so.

The situation in Denver is generally comparable to that in other large cities across the country in which there is a substantial minority population and where desegregation has not been ordered by the federal courts. There is segregation in the schools of many of these cities fully as pervasive as that in southern cities prior to the desegregation decrees of the past decade and a half. The focus of the school desegregation problem has now shifted from the South to the country as a whole. Unwilling and footdragging as the process was in most places, substantial progress toward achieving integration has been made in Southern States.[3] No comparable progress has been made in many nonsouthern cities with large minority populations[4] primarily because of the *de facto/de jure*

---

[3] According to the 1971 Department of Health, Education, and Welfare (HEW) estimate, 43.9% of Negro pupils attended majority white schools in the South as opposed to only 27.8% who attended such schools in the North and West. Fifty-seven percent of all Negro pupils in the North and West attend schools with over 80% minority population as opposed to 32.2% who do so in the South. 118 Cong. Rec. 564 (1972).

[4] The 1971 HEW Enrollment Survey dramatized the segregated character of public school systems in many nonsouthern cities. The percentage of Negro pupils which attended schools more than 80% black was 91.3 in Cleveland, Ohio; 97.8 in Compton, California; 78.1 in Dayton, Ohio; 78.6 in Detroit, Michigan; 95.7 in Gary,

distinction nurtured by the courts and accepted complacently by many of the same voices which denounced the evils of segregated schools in the South.[5]   But if our national concern is for those who attend such schools, rather than for perpetuating a legalism rooted in history rather than present reality, we must recognize that the evil of operating separate schools is no less in Denver than in Atlanta.

I

In my view we should abandon a distinction which long since has outlived its time, and formulate constitutional principles of national rather than merely regional application.   When *Brown* v. *Board of Education,* 347 U. S. 483 (1954) *(Brown I),* was decided, the distinction between

Indiana; 86.4 in Kansas City, Missouri; 86.6 in Los Angeles, California; 78.8 in Milwaukee, Wisconsin; 91.3 in Newark, New Jersey; 89.8 in St. Louis, Missouri.   The full data from the Enrollment Survey may be found in 118 Cong. Rec. 563–566 (1972).

[5] As Senator Ribicoff recognized:

"For years we have fought the battle of integration primarily in the South where the problem was severe.   It was a long, arduous fight that deserved to be fought and needed to be won.

"Unfortunately, as the problem of racial isolation has moved north of the Mason-Dixon line, many northerners have bid an evasive farewell to the 100-year struggle for racial equality.   Our motto seems to have been 'Do to southerners what you do not want to do to yourself.'

"Good reasons have always been offered, of course, for not moving vigorously ahead in the North as well as the South.

"First, it was that the problem was worse in the South.   Then the facts began to show that that was no longer true.

"We then began to hear the de facto-de jure refrain.

"Somehow residential segregation in the North was accidental or de facto and that made it better than the legally supported de jure segregation of the South.   It was a hard distinction for black children in totally segregated schools in the North to understand, but it allowed us to avoid the problem."   118 Cong. Rec. 5455 (1972).

*de jure* and *de facto* segregation was consistent with the limited constitutional rationale of that case. The situation confronting the Court, largely confined to the Southern States, was officially imposed racial segregation in the schools extending back for many years and usually embodied in constitutional and statutory provisions.

The great contribution of *Brown I* was its holding in unmistakable terms that the Fourteenth Amendment forbids state-compelled or state-authorized segregation of public schools. 347 U. S., at 488, 493–495. Although some of the language was more expansive, the holding in *Brown I* was essentially negative: It was impermissible under the Constitution for the States, or their instrumentalities, to force children to attend segregated schools. The forbidden action was *de jure,* and the opinion in *Brown I* was construed—for some years and by many courts—as requiring only state neutrality, allowing "freedom of choice" as to schools to be attended so long as the State itself assured that the choice was genuinely free of official restraint.[6]

But the doctrine of *Brown I,* as amplified by *Brown II,* 349 U. S. 294 (1955), did not retain its original meaning. In a series of decisions extending from 1954 to 1971 the

---

[6] See, *e. g., Bradley* v. *School Board,* 345 F. 2d 310, 316 (CA4 1965) (en banc):

"It has been held again and again . . . that the Fourteenth Amendment prohibition is not against segregation as such. . . . A state or a school district offends no constitutional requirement when it grants to all students uniformly an unrestricted freedom of choice as to schools attended, so that each pupil, in effect, assigns himself to the school he wishes to attend." The case was later vacated and remanded by this Court, which expressed no view on the merits of the desegregation plans submitted. 382 U. S. 103, 105 (1965). See also *Bell* v. *School City of Gary, Ind.,* 324 F. 2d 209 (CA7 1963); *Downs* v. *Board of Education,* 336 F. 2d 988 (CA10 1964); *Deal* v. *Cincinnati Board of Education,* 369 F. 2d 55 (CA6 1966).

concept of state neutrality was transformed into the present constitutional doctrine requiring affirmative state action to desegregate school systems.[7] The keystone case was *Green* v. *County School Board*, 391 U. S. 430, 437–438 (1968), where school boards were declared to have "the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." The school system before the Court in *Green* was operating in a rural and sparsely settled county where there were no concentrations of white and black populations, no neighborhood school system (there were only two schools in the county), and none of the problems of an urbanized school district.[8] The Court properly identified the freedom-of-choice program there as a subterfuge, and the language in *Green* imposing an affirmative duty to convert to a unitary system was appropriate on the facts before the Court. There was, however, reason to question to what extent this duty would apply in the vastly different factual setting of a large city with extensive areas of residential segregation, presenting problems and calling for solutions quite different from those in the rural setting of New Kent County, Virginia.

But the doubt as to whether the affirmative-duty concept would flower into a new constitutional principle of general application was laid to rest by *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1 (1971), in which the duty articulated in *Green* was applied to the

---

[7] For a concise history and commentary on the evolution, see generally A. Bickel, The Supreme Court and the Idea of Progress 126–130 (1970).

[8] See also the companion cases in *Raney* v. *Board of Education*, 391 U. S. 443 (1968), and *Monroe* v. *Board of Commissioners*, 391 U. S. 450 (1968), neither of which involved large urban or metropolitan areas.

urban school system of metropolitan Charlotte, North Carolina. In describing the residential patterns in Charlotte, the Court noted the "familiar phenomenon" in the metropolitan areas of minority groups being "concentrated in one part of the city," 402 U. S., at 25, and acknowledged that:

> "Rural areas accustomed for half a century to the consolidated school systems implemented by bus transportation could make adjustments more readily than metropolitan areas with dense and shifting population, numerous schools, congested and complex traffic patterns." 402 U. S., at 14.

Despite this recognition of a fundamentally different problem from that involved in *Green,* the Court nevertheless held that the affirmative-duty rule of *Green* was applicable, and prescribed for a metropolitan school system with 107 schools and some 84,000 pupils essentially the same remedy—elimination of segregation "root and branch"—which had been formulated for the two schools and 1,300 pupils of New Kent County.

In *Swann,* the Court further noted it was concerned only with States having "a long history" of officially imposed segregation and the duty of school authorities in those States to implement *Brown I.* 402 U. S., at 5–6. In so doing, the Court refrained from even considering whether the evolution of constitutional doctrine from *Brown I* to *Green/Swann* undercut whatever logic once supported the *de facto/de jure* distinction. In imposing on metropolitan southern school districts an affirmative duty, entailing large-scale transportation of pupils, to eliminate segregation in the schools, the Court required these districts to alleviate conditions which in large part did *not* result from historic, state-imposed *de jure* segregation. Rather, the familiar root cause of segregated schools in *all* the biracial metropolitan areas of our country is essen-

tially the same: one of segregated residential and migratory patterns the impact of which on the racial composition of the schools was often perpetuated and rarely ameliorated by action of public school authorities. This is a national, not a southern, phenomenon. And it is largely unrelated to whether a particular State had or did not have segregative school laws.[9]

Whereas *Brown I* rightly decreed the elimination of state-imposed segregation in that particular section of the country where it did exist, *Swann* imposed obligations on southern school districts to eliminate conditions which are not regionally unique but are similar both in origin and effect to conditions in the rest of the country. As the remedial obligations of *Swann* extend far beyond the elimination of the outgrowths of the state-imposed segregation outlawed in *Brown,* the rationale of *Swann* points inevitably toward a uniform, constitutional approach to our national problem of school segregation.

## II

The Court's decision today, while adhering to the *de jure/de facto* distinction, will require the application

---

[9] As Dr. Karl Taeuber states in his article, Residential Segregation, 213 Scientific American 12, 14 (Aug. 1965):

"No elaborate analysis is necessary to conclude from these figures that a high degree of residential segregation based on race is a universal characteristic of American cities. This segregation is found in the cities of the North and West as well as of the South; in large cities as well as small; in nonindustrial cities as well as industrial; in cities with hundreds of thousands of Negro residents as well as those with only a few thousand, and in cities that are progressive in their employment practices and civil rights policies as well as those that are not."

In his book, Negroes in Cities (1965), Dr. Taeuber stated that residential segregation exists "regardless of the character of local laws and policies, and regardless of the extent of other forms of segregation or discrimination." *Id.,* at 36.

of the *Green/Swann* doctrine of "affirmative duty" to the Denver School Board despite the absence of any history of state-mandated school segregation. The only evidence of a constitutional violation was found in various decisions of the School Board. I concur in the Court's position that the public school authorities are the responsible agency of the State, and that if the affirmative-duty doctrine is sound constitutional law for Charlotte, it is equally so for Denver. I would not, however, perpetuate the *de jure/de facto* distinction nor would I leave to petitioners the initial tortuous effort of identifying "segregative acts" and deducing "segregative intent." I would hold, quite simply, that where segregated public schools exist within a school district to a substantial degree, there is a prima facie case that the duly constituted public authorities (I will usually refer to them collectively as the "school board") are sufficiently responsible [10] to warrant imposing upon them a nationally applicable burden to demonstrate they nevertheless are operating a genuinely integrated school system.

### A

The principal reason for abandonment of the *de jure/ de facto* distinction is that, in view of the evolution of the holding in *Brown I* into the affirmative-duty doctrine, the distinction no longer can be justified on a principled basis. In decreeing remedial requirements for the Charlotte/Mecklenburg school district, *Swann* dealt with a metropolitan, urbanized area in which the basic

---

[10] A prima facie case of constitutional violation exists when segregation is found to a substantial degree in the schools of a particular district. It is recognized, of course, that this term is relative and provides no precise standards. But circumstances, demographic and otherwise, vary from district to district and hard-and-fast rules should not be formulated. The existence of a substantial percentage of schools populated by students from one race only or predominantly so populated, should trigger the inquiry.

causes of segregation were generally similar to those in all sections of the country, and also largely irrelevant to the existence of historic, state-imposed segregation at the time of the *Brown* decision. Further, the extension of the affirmative-duty concept to include compulsory student transportation went well beyond the mere remedying of that portion of school segregation for which former state segregation laws were ever responsible. Moreover, as the Court's opinion today abundantly demonstrates, the facts deemed necessary to establish *de jure* discrimination present problems of subjective intent which the courts cannot fairly resolve.

At the outset, one must try to identify the constitutional right which is being enforced. This is not easy, as the precedents have been far from explicit. In *Brown I,* after emphasizing the importance of education, the Court said that:

> "Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." 347 U. S., at 493.

In *Brown II,* the Court identified the "fundamental principle" enunciated in *Brown I* as being the unconstitutionality of "racial discrimination in public education," 349 U. S., at 298, and spoke of "the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis." 349 U. S., at 300. Although this and similar language is ambiguous as to the specific constitutional right, it means—as a minimum—that one has the right not to be compelled by state action to attend a segregated school system. In the evolutionary process since 1954, decisions of this Court have added a significant gloss to this original right. Although nowhere expressly articulated in these terms, I would now define it as the right, derived from the Equal Protection Clause, to expect that once the State has as-

sumed responsibility for education, local school boards will operate *integrated school systems* within their respective districts.[11] This means that school authorities, consistent with the generally accepted educational goal of attaining quality education for all pupils, must make and implement their customary decisions with a view toward enhancing integrated school opportunities.

The term "integrated school system" presupposes, of course, a total absence of any laws, regulations, or policies supportive of the type of "legalized" segregation condemned in *Brown*. A system would be integrated in accord with constitutional standards if the responsible authorities had taken appropriate steps to (i) integrate faculties and administration; (ii) scrupulously assure equality of facilities, instruction, and curriculum opportunities throughout the district; (iii) utilize their authority to draw attendance zones to promote integration; and (iv) locate new schools, close old ones, and determine the size and grade categories with this same objective in mind. Where school authorities decide to undertake the transportation of students, this also must be with integrative opportunities in mind.

The foregoing prescription is not intended to be either definitive or all-inclusive, but rather an indication of the contour characteristics of an *integrated school system* in which all citizens and pupils may justifiably be confident that racial discrimination is neither practiced nor tolerated. An integrated school system does not

---

[11] See discussion in Part III, *infra*, of the remedial action which is appropriate to accomplish *desegregation* where a court finds that a school board has failed to operate an *integrated school system* within its district. Plaintiffs must, however, establish the failure of a school board to operate an integrated school system before a court may order desegregative steps by way of remedy. These are two distinct steps which recognize the necessity of proving the constitutional violation before desegregative remedial action can be ordered.

mean—and indeed could not mean in view of the residential patterns of most of our major metropolitan areas—that *every school* must in fact be an integrated unit. A school which happens to be all or predominantly white or all or predominantly black is not a "segregated" school in an unconstitutional sense if the system itself is a genuinely integrated one.

Having school boards operate an integrated school system provides the best assurance of meeting the constitutional requirement that racial discrimination, subtle or otherwise, will find no place in the decisions of public school officials. Courts judging past school board actions with a view to their *general integrative effect* will be best able to assure an absence of such discrimination while avoiding the murky, subjective judgments inherent in the Court's search for "segregative intent." Any test resting on so nebulous and elusive an element as a school board's segregative "intent" provides inadequate assurance that minority children will not be short-changed in the decisions of those entrusted with the non-discriminatory operation of our public schools.

Public schools are creatures of the State, and whether the segregation is state-created or state-assisted or merely state-perpetuated should be irrelevant to constitutional principle. The school board exercises pervasive and continuing responsibility over the long-range planning as well as the daily operations of the public school system. It sets policies on attendance zones, faculty employment and assignments, school construction, closings and consolidations, and myriad other matters. School board decisions obviously are not the sole cause of segregated school conditions. But if, after such detailed and complete public supervision, substantial school segregation still persists, the presumption is strong that the school board, by its acts or omissions, is in some part responsible. Where state action and supervision are so

pervasive and where, after years of such action, segregated schools continue to exist within the district to a substantial degree, this Court is justified in finding a prima facie case of a constitutional violation. The burden then must fall on the school board to demonstrate it is operating an "integrated school system."

It makes little sense to find prima facie violations and the consequent affirmative duty to desegregate solely in those States with state-imposed segregation at the time of the *Brown* decision. The history of state-imposed segregation is more widespread in our country than the *de jure/de facto* distinction has traditionally cared to recognize.[12] As one commentator has noted:

> "[T]he three court of appeals decisions denying a constitutional duty to abolish de facto segregation all arose in cities—Cincinnati, Gary, and Kansas City, Kansas—where racial segregation in schools was formerly mandated by state or local law. [*Deal* v. *Cincinnati Board of Education*, 369 F. 2d 55 (CA6 1966), cert. denied, 389 U. S. 847 (1967); *Downs* v. *Board of Education*, 336 F. 2d 988 (CA10 1964), cert. denied, 380 U. S. 914 (1965); *Bell* v. *School City of Gary, Ind.*, 324 F. 2d 209 (CA7 1963), cert. denied, 377 U. S. 924 (1964).] Ohio discarded its statute in 1887, Indiana in 1949, and Kansas City not until the advent of *Brown*. If Negro and white parents in

---

[12] Indeed, if one goes back far enough, it is probable that all racial segregation, wherever occurring and whether or not confined to the schools, has at some time been supported or maintained by government action. In *Beckett* v. *School Board*, 308 F. Supp. 1274, 1311–1315 (ED Va. 1969), Judge Hoffman compiled a summary of past public segregative action which included examples from a great majority of States. He concluded that "[o]nly as to the states of Maine, New Hampshire, Vermont, Washington, Nevada, and Hawaii does it appear from this nonexhaustive research that no discriminatory laws appeared on the books at one time or another." *Id.*, at 1315.

Mississippi are required to bus their children to distant schools on the theory that the consequences of past de jure segregation cannot otherwise be dissipated, should not the same reasoning apply in Gary, Indiana, where no more than five years before *Brown* the same practice existed with presumably the same effects?" Goodman, De Facto School Segregation: A Constitutional and Empirical Analysis, 60 Calif. L. Rev. 275, 297 (1972).[13]

Not only does the *de jure/de facto* distinction operate inequitably on communities in different sections of the country, more importantly, it disadvantages minority children as well. As the Fifth Circuit stated:

" 'The Negro children in Cleveland, Chicago, Los Angeles, Boston, New York, or any other area of the nation which the opinion classifies under de facto segregation, would receive little comfort from the assertion that the racial make-up of their school system does not violate their constitutional rights because they were born into a de facto society, while the exact same racial make-up of the school system in the 17 Southern and border states violates the

---

[13] The author continues:

"True, the earlier the policy of segregation was abandoned the less danger there is that it continues to operate covertly, is significantly responsible for present day patterns of residential segregation, or has contributed materially to present community attitudes toward Negro schools. But there is no reason to suppose that 1954 is a universally appropriate dividing line between de jure segregation that may safely be assumed to have spent itself and that which may not. For many remedial purposes, adoption of an arbitrary but easily administrable cutoff point might not be objectionable. But in a situation such as school desegregation, where both the rights asserted and the remedial burdens imposed are of such magnitude, and where the resulting sectional discrimination is passionately resented, it is surely questionable whether such arbitrariness is either politically or morally acceptable."

constitutional rights of their counterparts, or even their blood brothers, because they were born into a de jure society. All children everywhere in the nation are protected by the Constitution, and treatment which violates their constitutional rights in one area of the country, also violates such constitutional rights in another area.' " *Cisneros* v. *Corpus Christi Independent School District*, 467 F. 2d 142, 148 (CA5 1972) (en banc), quoting *United States* v. *Jefferson County Board of Education*, 380 F. 2d 385, 397 (CA5 1967) (Gewin, J., dissenting).[14]

The Court today does move for the first time toward breaking down past sectional disparities, but it clings tenuously to its distinction. It searches for *de jure* action in what the Denver School Board has done or failed to do, and even here the Court does not rely upon the results or effects of the Board's conduct but feels compelled to find segregative intent: [15]

"We emphasize that the differentiating factor between *de jure* segregation and so-called *de facto*

---

[14] See Bickel, *supra*, n. 7, at 119:
"If a Negro child perceives his separation as discriminatory and invidious, he is not, in a society a hundred years removed from slavery, going to make fine distinctions about the source of a particular separation."

[15] The Court today does not require, however, a segregative intent with respect to the entire school system, and indeed holds that if such an intent is found with respect to some schools in a system, the burden—normally on the plaintiffs—shifts to the defendant school authorities to prove a negative: namely, that their purposes were benign, *ante*, at 207–209.

The Court has come a long way since *Brown I*. Starting from the unassailable *de jure* ground of the discriminatory constitutional and statutory provisions of some States, the new formulation—still professing fidelity to the *de jure* doctrine—is that desegregation will be ordered despite the absence of any segregative laws if: (i) segregated schools in fact exist; (ii) a court finds that they result from

segregation to which we referred in *Swann* is *purpose or intent* to segregate." *Ante,* at 208 (emphasis is the Court's).

The Court's insistence that the "differentiating factor" between *de jure* and *de facto* segregation be "purpose or intent" is difficult to reconcile with the language in so recent a case as *Wright* v. *Council of the City of Emporia,* 407 U. S. 451 (1972). In holding there that "motivation" is irrelevant, the Court said:

"In addition, an inquiry into the 'dominant' motivation of school authorities is as irrelevant as it is fruitless. The mandate of *Brown II* was to desegregate schools, and we have said that '[t]he measure of any desegregation plan is its effectiveness.' *Davis* v. *School Commissioners of Mobile County,* 402 U. S. 33, 37. Thus, we have focused upon the effect—not the purpose or motivation—of a school board's action in determining whether it is a permissible method of dismantling a dual system. . . .

". . . Though the *purpose* of the new school districts was found to be discriminatory in many of these cases, the courts' holdings rested not on motivation or purpose but on the *effect* of the action upon the dismantling of the dual school systems involved. That was the focus of the District Court in this case, and we hold that its approach was proper." 407 U. S., at 462.

I can discern no basis in law or logic for holding that the motivation of school board action is irrelevant in Virginia and controlling in Colorado. It may be argued, of course, that in *Emporia* a prior constitutional viola-

---

some action taken with segregative intent by the school board; (iii) such action relates to any "meaningful segment" of the school system; and (iv) the school board cannot prove that its intentions with respect to the remainder of the system were nonsegregative.

tion had already been proved and that this justifies the distinction. The net result of the Court's language, however, is the application of an *effect* test to the actions of southern school districts and an *intent* test to those in other sections, at least until an initial *de jure* finding for those districts can be made. Rather than straining to perpetuate any such dual standard, we should hold forthrightly that significant segregated school conditions in any section of the country are a prima facie violation of constitutional rights. As the Court has noted elsewhere:

> "Circumstances or chance may well dictate that no persons in a certain class will serve on a particular jury or during some particular period. But it taxes our credulity to say that *mere chance* resulted in there being no members of this class among the over six thousand jurors called in the past 25 years. *The result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner.*" *Hernandez* v. *Texas*, 347 U. S. 475, 482 (1954). (Emphasis added.)

### B

There is thus no reason as a matter of constitutional principle to adhere to the *de jure/de facto* distinction in school desegregation cases. In addition, there are reasons of policy and prudent judicial administration which point strongly toward the adoption of a uniform national rule. The litigation heretofore centered in the South already is surfacing in other regions. The decision of the Court today, emphasizing as it does the elusive element of segregative intent, will invite numerous desegregation suits in which there can be little hope of uniformity of result.

The issue in these cases will not be whether segregated education exists. This will be conceded in most of them.

The litigation will focus as a consequence of the Court's decision on whether segregation has resulted in any "meaningful or significant" portion of a school system from a school board's "segregative intent." The intractable problems involved in litigating this issue are obvious to any lawyer. The results of litigation—often arrived at subjectively by a court endeavoring to ascertain the subjective intent of school authorities with respect to action taken or not taken over many years—will be fortuitous, unpredictable and even capricious.

The Denver situation is illustrative of the problem. The courts below found evidence of *de jure* violations with respect to the Park Hill schools and an absence of such violations with respect to the core city schools, despite the fact that actions taken by the school board with regard to those two sections were not dissimilar. It is, for example, quite possible to contend that both the construction of Manual High School in the core city area and Barrett Elementary School in the Park Hill area operated to serve their surrounding Negro communities and, in effect, to merge school attendance zones with segregated residential patterns. See Brief for Petitioners 80–83. Yet findings even on such similar acts will, under the *de jure/de facto* distinction, continue to differ, especially since the Court has never made clear what suffices to establish the requisite "segregative intent" for an initial constitutional violation. Even if it were possible to clarify this question, wide and unpredictable differences of opinion among judges would be inevitable when dealing with an issue as slippery as "intent" or "purpose," especially when related to hundreds of decisions made by school authorities under varying conditions over many years.

This Court has recognized repeatedly that it is "extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a

234

legislative enactment," *Palmer* v. *Thompson,* 403 U. S. 217, 224 (1971) ; *McGinnis* v. *Royster,* 410 U. S. 263, 276–277 (1973) ; *United States* v. *O'Brien,* 391 U. S. 367, 381 (1968). Whatever difficulties exist with regard to a single statute will be compounded in a judicial review of years of administration of a large and complex school system.[16] Every act of a school board and school administration, and indeed every failure to act where affirmative action is indicated, must now be subject to scrutiny. The most routine decisions with respect to the operation of schools, made almost daily, can affect in varying degrees the extent to which schools are initially segregated, remain in that condition, are desegregated, or—for the long term future—are likely to be one or the other. These decisions include action or nonaction with respect to school building construction and location; the timing of building new schools and their size; the closing and consolidation of schools; the drawing or gerrymandering of

---

[16] As one commentator has expressed it:

"If the courts are indeed prepared to inquire into motive, thorny questions will arise even if one assumes that racial motivation is capable of being proven at trial. What of the case in which one or more members of a school board, but less than a majority, are found to have acted on racial grounds? What if it appears that the school board's action was prompted by a mixture of motives, including constitutionally innocent ones that alone would have prompted the board to act? What if the members of the school board were not themselves racially inspired but wished to please their constituents, many of whom they knew to be so? If such cases are classified as unconstitutional de jure segregation, there is little point in preserving the de jure-de facto distinction at all. And it may well be that the difference between any of these situations and one in which racial motivation is altogether lacking is too insignificant, from the standpoint of both the moral culpability of the state officials and the impact upon the children involved, to support a difference in constitutional treatment." Goodman, De Facto School Segregation: A Constitutional and Empirical Analysis, 60 Calif. L. Rev. 275, 284–285 (1972).

student attendance zones; the extent to which a neighborhood policy is enforced; the recruitment, promotion and assignment of faculty and supervisory personnel; policies with respect to transfers from one school to another; whether, and to what extent, special schools will be provided, where they will be located, and who will qualify to attend them; the determination of curriculum, including whether there will be "tracks" that lead primarily to college or to vocational training, and the routing of students into these tracks; and even decisions as to social, recreational, and athletic policies.

In *Swann* the Court did not have to probe into segregative intent and proximate cause with respect to each of these "endless" factors. The basis for its *de jure* finding there was rooted primarily in the prior history of the desegregation suit. 402 U. S., at 5–6. But in a case of the present type, where no such history exists, a judicial examination of these factors will be required under today's decision. This will lead inevitably to uneven and unpredictable results, to protracted and inconclusive litigation, to added burdens on the federal courts, and to serious disruption of individual school systems. In the absence of national and objective standards, school boards and administrators will remain in a state of uncertainty and disarray, speculating as to what is required and when litigation will strike.

## C

Rather than continue to prop up a distinction no longer grounded in principle, and contributing to the consequences indicated above, we should acknowledge that whenever public school segregation exists to a substantial degree there is prima facie evidence of a constitutional violation by the responsible school board. It is true, of course, that segregated schools—wherever located—are not solely the product of the action or

inaction of public school authorities. Indeed, as indicated earlier, there can be little doubt that principal causes of the pervasive school segregation found in the major urban areas of this country, whether in the North, West, or South, are the socio-economic influences which have concentrated our minority citizens in the inner cities while the more mobile white majority disperse to the suburbs. But it is also true that public school boards have continuing, detailed responsibility for the public school system within their district and, as Judge John Minor Wisdom has noted, "[w]hen the figures [showing segregation in the schools] speak so eloquently, a *prima facie* case of discrimination is established." *United States* v. *Texas Education Agency,* 467 F. 2d 848, 873 (CA5 1972) (en banc). Moreover, as foreshadowed in *Swann* and as implicitly held today, school boards have a duty to minimize and ameliorate segregated conditions by pursuing an affirmative policy of desegregation. It is this policy which must be applied consistently on a national basis without regard to a doctrinal distinction which has outlived its time.

### III

The preceding section addresses the constitutional obligation of public authorities in the school districts throughout our country to operate *integrated school systems.* When the schools of a particular district are found to be substantially segregated, there is a prima facie case that this obligation has not been met. The burden then shifts to the school authorities to demonstrate that they have in fact operated an integrated system as this term is defined, *supra,* at 227–228. If there is a failure successfully to rebut the prima facie case, the question then becomes what reasonable affirmative desegregative steps district courts may require to

place the school system in compliance with the constitutional standard. In short, what specifically is the nature and scope of the remedy?

As the Court's opinion virtually compels the finding on remand that Denver has a "dual school system," that city will then be under an "affirmative duty" to desegregate its entire system "root and branch." *Green* v. *County School Board,* 391 U. S., at 437–438. Again, the critical question is, what ought this constitutional duty to entail?

### A

The controlling case is *Swann, supra,* and the question which will confront and confound the District Court and Denver School Board is what, indeed, does *Swann* require? *Swann* purported to enunciate no new principles, relying heavily on *Brown I* and *II* and on *Green*. Yet it affirmed a district court order which had relied heavily on "racial ratios" and sanctioned transportation of elementary as well as secondary pupils. Lower federal courts have often read *Swann* as requiring far-reaching transportation decrees [17] "to achieve the greatest possible degree of actual

---

[17] See, *e. g., Thompson* v. *School Board of Newport News,* 465 F. 2d 83, 87 (1972), where the Fourth Circuit en banc upheld a district court assignment plan where "travel time, varying from a minimum of forty minutes and a maximum of one hour, each way, would be required for busing black students out of the old City and white students into the old City in order to achieve a racial balancing of the district." This transportation was decreed for children from the third grade up, involving children as young as eight years of age.

In *Northcross* v. *Board of Education of Memphis City Schools,* 466 F. 2d 890, 895 (1972), the Sixth Circuit affirmed a district court assignment plan which daily transported 14,000 children with "the maximum time to be spent on the buses by any child [being] 34 minutes . . . ," presumably each way. But as Judge Weick noted in dissent the Sixth Circuit instructed the district judge to implement yet further desegregation orders. Plans presently under consideration by that court call for the busing of ·39,085 and 61,530

desegregation." 402 U. S., at 26. In the context of a large urban area, with heavy residential concentrations of white and black citizens in different—and widely separated—sections of the school district, extensive dispersal and transportation of pupils is inevitable if *Swann* is read as expansively as many courts have been reading it to date.

To the extent that *Swann* may be thought to *require* large-scale or long-distance transportation of students in our metropolitan school districts, I record my profound misgivings. Nothing in our Constitution commands or encourages any such court-compelled disruption of public education. It may be more accurate to view *Swann* as having laid down a broad rule of reason under which desegregation remedies must remain flexible and other values and interests be considered. Thus the Court recognized that school authorities, not the federal judiciary, must be charged in the first instance with the task of desegregating local school systems. *Id.,* at 16. It noted that school boards in rural areas can adjust more readily to this task than those in metropolitan districts "with dense and shifting population, numerous schools, congested and complex traffic patterns." *Id.,* at 14. Although the use of pupil transportation was approved as a remedial device, transportation orders are suspect "when the time or distance of travel is so great

---

children respectively, for undetermined lengths of time. *Id.,* at 895–896.

Petitioners before this Court in *Potts* v. *Flax,* No. 72–288, cert. denied, 409 U. S. 1007 (1972), contended that the implementation of the Fifth Circuit's directive in *Flax* v. *Potts,* 464 F. 2d 865 (1972), would require bus rides of up to two hours and 20 minutes each day and a round trip of up to 70 miles. Pet. for Cert. 14. While respondents contended these figures represent an "astounding inflation," Brief in Opposition 7, transportation of a significant magnitude seems inevitable.

as to either risk the health of the children or significantly impinge on the educational process." *Id.*, at 30–31. Finally, the age of the pupils to be transported was recognized by the Court in *Swann* as one important limitation on the time of student travel. *Id.*, at 31.

These factors were supposed to help guide district courts in framing equitable remedies in school desegregation cases.[18] And the Court further emphasized that equitable decrees are inherently sensitive, not solely to the degree of desegregation to be achieved, but to a variety of other public and private interests:

> "[A] school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution. *Id.*, at 15–16.

Those words echoed a similar expression in *Brown II*, 349 U. S., at 300:

> "In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs."

Thus, in school desegregation cases, as elsewhere, equity counsels reason, flexibility, and balance. See, *e. g., Lemon*

---

[18] See *United States* v. *Texas Education Agency*, 467 F. 2d 848, 883 (CA5 1972) (Bell, J., concurring in an opinion in which seven other judges joined):

"In our view the remedy which the district court is required to formulate should be formulated within the *entire context* of the opinion in Swann v. Charlotte-Mecklenburg Board of Education . . . ." (Emphasis added.)

v. *Kurtzman,* 411 U. S. 192 (1973). I am aware, of course, that reasonableness in any area is a relative and subjective concept. But with school desegregation, reasonableness would seem to embody a balanced evaluation of the obligation of public school boards to promote desegregation with other, equally important educational interests which a community may legitimately assert. Neglect of either the obligation or the interests destroys the even-handed spirit with which equitable remedies must be approached.[19] Overzealousness in pursuit of any single goal is untrue to the tradition of equity and to the "balance" and "flexibility" which this Court has always respected.

## B

Where school authorities have defaulted in their duty to operate an integrated school system, district courts must insure that affirmative desegregative steps ensue. Many of these can be taken effectively without damaging state and parental interests in having children attend schools within a reasonable vicinity of home. Where desegregative steps are possible within the framework of a system of "neighborhood education," school authorities must pursue them. For example, boundaries of neighborhood attendance zones should be drawn to integrate, to the extent practicable, the school's student body. Construction of new schools should be of

---

[19] The relevant inquiry is "whether the costs of achieving desegregation in any given situation outweigh the legal, moral, and educational considerations favoring it. . . . It is clear . . . that the Constitution should not be held to require any transportation plan that keeps children on a bus for a substantial part of the day, consumes significant portions of funds otherwise spendable directly on education, or involves a genuine element of danger to the safety of the child." Comment, School Desegregation After *Swann:* A Theory of Government Responsibility, 39 U. Chi. L. Rev. 421, 422, 443 (1972).

such a size and at such a location as to encourage the likelihood of integration, *Swann, supra,* at 21. Faculty integration should be attained throughout the school system, *id.,* at 19; *United States* v. *Montgomery County Board of Education,* 395 U. S. 225 (1969). An optional majority-to-minority transfer program, with the State providing free transportation to desiring students, is also a helpful adjunct to a desegregated school system. *Swann, supra,* at 26–27. It hardly need be repeated that allocation of resources within the school district must be made with scrupulous fairness among all schools.

The above examples are meant to be illustrative, not exhaustive. The point is that the overall integrative impact of such school board decisions must be assessed by district courts in deciding whether the duty to desegregate has been met. For example, "neighborhood school plans are constitutionally suspect when attendance zones are superficially imposed upon racially defined neighborhoods, and when school construction preserves rather than elimi- nates the racial homogeny [*sic*] of given schools."[20] *Keyes* v. *School District No. 1,* 445 F. 2d 990, 1005 (CA10 1971). See also *United States* v. *Board of Educa- tion of Tulsa County,* 429 F. 2d 1253, 1258–1259 (CA10 1970). This does not imply that decisions on faculty assignment, attendance zones, school construction, closing and consolidation, must be made to the detriment of all neutral, nonracial considerations. But these considera- tions can, with proper school board initiative, generally be met in a manner that will enhance the degree of school desegregation.

## C

Defaulting school authorities would have, at a mini- mum, the obligation to take affirmative steps of the sort

---

[20] A useful study of the historical uses and abuses of the neighbor- hood school concept is M. Weinberg, Race & Place (1967).

outlined in the above section. School boards would, of course, be free to develop and initiate further plans to promote school desegregation. In a pluralistic society such as ours, it is essential that no racial minority feel demeaned or discriminated against and that students of all races learn to play, work, and cooperate with one another in their common pursuits and endeavors. Nothing in this opinion is meant to discourage school boards from exceeding minimal constitutional standards in promoting the values of an integrated school experience.

A *constitutional requirement* of extensive student transportation solely to achieve integration presents a vastly more complex problem. It promises, on the one hand, a greater degree of actual desegregation, while it infringes on what may fairly be regarded as other important community aspirations and personal rights. Such a requirement is also likely to divert attention and resources from the foremost goal of any school system: the best quality education for all pupils. The Equal Protection Clause does, indeed, command that racial discrimination not be tolerated in the decisions of public school authorities. But it does not require that school authorities undertake widespread student transportation solely for the sake of maximizing integration.[21]

---

[21] In fact, due to racially separate residential patterns that characterize our major urban areas it is quite unrealistic to think of achieving in many cities substantial integration throughout the school district without a degree of student transportation which would have the gravest economic and educational consequences. As Professor Bickel notes:

"In most of the larger urban areas, demographic conditions are such that no policy that a court can order, and a school board, a city, or even a state has the capability to put into effect, will in fact result in the foreseeable future in racially balanced public schools. Only a reordering of the environment involving economic and social policy on the broadest conceivable front might have an appreciable impact." Bickel, *supra*, n. 7, at 132.

This obviously does not mean that bus transportation has no place in public school systems or is not a permissible means in the desegregative process. The transporting of school children is as old as public education, and in rural and some suburban settings it is as indispensable as the providing of books. It is presently estimated that approximately half of all American children ride buses to school for reasons unrelated to integration.[22] At the secondary level in particular, where the schools are larger and serve a wider, more dispersed constituency than elementary schools, some form of public or privately financed transportation is often necessary. There is a significant difference, however, in transportation plans voluntarily initiated by local school boards for educational purposes and those imposed by a federal court. The former usually represent a necessary or convenient means of access to the school nearest home; the latter often require lengthy trips for no purpose other than to further integration.[23] Yet the

---

[22] Estimates vary. *Swann*, 402 U. S., at 29, noted that "[e]ighteen million of the Nation's public school children, approximately 39%, were transported to their schools by bus in 1969–1970 in all parts of the country." Senator Ribicoff, a thoughtful student of this problem, stated that "[t]wo-thirds of all American children today ride buses to schools for reasons unrelated to integration." 118 Cong. Rec. 5456 (1972).

[23] Historically, distant transportation was wrongly used to promote segregation. "Negro children were generally considered capable of traveling longer distances to school and without the aid of any vehicle. What was too far for a white child became reasonably near for a Negro child," Weinberg, *supra*, n. 20, at 87.

This deplorable history has led some to argue that integrative bus rides are justified as atonement for past segregative trips and that neighborhood education is now but a code word for racial segregation. But misuse of transportation in the past does not imply neighborhood schooling has no valid nonsegregative uses for the present. Nor would wrongful transportation in the past justify detrimental transportation for the children of today.

Court in *Swann* was unquestionably right in describing bus transportation as "one tool of school desegregation." 402 U. S., at 30.[24] The crucial issue is when, under what circumstances, and to what extent such transportation may appropriately be ordered. The answer to this turns—as it does so often in the law—upon a sound exercise of discretion under the circumstances.

*Swann* itself recognized limits to desegregative obligations. It noted that a constitutional requirement of "any particular degree of racial balance or mixing . . . would be disapproved . . . ," and sanctioned district court use of mathematical ratios as "no more than a starting point in the process of shaping a remedy . . . ." *Id.,* at 24, 25. Thus, particular schools may be all white or all black and still not infringe constitutional rights if the *system* is genuinely integrated and school authorities are pursuing integrative steps short of extensive and disruptive transportation. The refusal of the Court in *Swann* to require racial balance in schools throughout the district or the arbitrary elimination of all "one-race schools," *id.,* at 26, is grounded in a recognition that

---

[24] Some communities had transportation plans in effect at the time of court desegregation orders. See *Swann, supra,* at 29 n. 11; *Davis v. Board of School Commissioners of Mobile County,* 402 U. S. 33, 34–35 (1971). Courts have used the presence or absence of existing transportation in a district as one factor in framing and implementing desegregation decrees. *United States v. Watson Chapel School District,* 446 F. 2d 933, 937 (CA8 1971); *Northcross v. Board of Education of Memphis City Schools,* 444 F. 2d 1179, 1182–1183 (CA6 1971); *Davis v. Board of Education of North Little Rock,* 328 F. Supp. 1197, 1203 (ED Ark. 1971). Where a school board is voluntarily engaged in transporting students, a district court is, of course, obligated to insure that such transportation is not undertaken with segregative effect. Where, also, voluntary transportation programs are already in progress, there may be greater justification for court-ordered transportation of students *for a comparable time and distance* to achieve greater integration.

the State, parents, and children all have at stake in school desegregation decrees, legitimate and recognizable interests.

The personal interest might be characterized as the desire that children attend community schools near home. Dr. James Coleman testified for petitioners at trial that "most school systems organize their schools in relation to the residents by having fixed school districts and some of these are very ethnically homogeneous." App. 1549a. In *Deal* v. *Cincinnati Board of Education*, 369 F. 2d, at 60, the Sixth Circuit summarized the advantages of such a neighborhood system of schools: [25]

> "Appellants, however, pose the question of whether the neighborhood system of pupil placement, fairly administered without racial bias, comports with the requirements of equal opportunity if it nevertheless results in the creation of schools with predominantly or even exclusively Negro pupils. The neighborhood system is in wide use throughout the nation and has been for many years the basis of school administration. This is so because it is acknowledged to have several valuable aspects which are an aid to education, such as minimization of safety hazards to children in reaching school, economy of cost in reducing transportation needs, ease of pupil

---

[25] The term "neighborhood school" should not be supposed to denote solely a walk-in school or one which serves children only in the surrounding blocks. The Court has noted, in a different context, that "[t]he word 'neighborhood' is quite as susceptible of variation as the word 'locality.' Both terms are elastic and, dependent upon circumstances, may be equally satisfied by areas measured by rods or by miles." *Connally* v. *General Construction Co.*, 269 U. S. 385, 395 (1926). In the school context, "neighborhood" refers to relative proximity, to a preference for a school nearer to, rather than more distant from, home.

placement and administration through the use of neutral, easily determined standards, and better home-school communication."

The neighborhood school does provide greater ease of parental and student access and convenience, as well as greater economy of public administration. These are obvious and distinct advantages, but the legitimacy of the neighborhood concept rests on more basic grounds.[26]

Neighborhood school systems, neutrally administered, reflect the deeply felt desire of citizens for a sense of community in their public education. Public schools have been a traditional source of strength to our Nation, and that strength may derive in part from the identification of many schools with the personal features of the surrounding neighborhood. Community support, interest, and dedication to public schools may well run higher with a neighborhood attendance pattern: distance may encourage disinterest. Many citizens sense today a decline in the intimacy of our institutions—home, church, and school—which has caused a concomitant decline in the unity and communal spirit of our people. I pass no judgment on this viewpoint, but I do believe that this Court should be wary of compelling in the name of constitutional law what may seem to many a dissolution in the traditional, more personal fabric of their public schools.

Closely related to the concept of a community and neighborhood education, are those rights and duties parents have with respect to the education of their children. The law has long recognized the parental duty to nurture, support, and provide for the welfare of children, includ-

---

[26] I do not imply that the neighborhood concept must be embodied in every school system. But where a school board has chosen it, federal judges should accord it respect in framing remedial decrees.

ing their education. In *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535, a unanimous Court held that:

> "Under the doctrine of *Meyer* v. *Nebraska*, 262 U. S. 390, we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. . . . The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."

And in *Griswold* v. *Connecticut*, 381 U. S. 479, 482 (1965), the Court noted that in *Pierce*, "the right to educate one's children as one chooses is made applicable to the States by the force of the First and Fourteenth Amendments." I do not believe recognition of this right can be confined solely to a parent's choice to send a child to public or private school. Most parents cannot afford the luxury of a private education for their children, and the dual obligation of private tuitions and public taxes. Those who may for numerous reasons seek public education for their children should not be forced to forfeit all interest or voice in the school their child attends. It would, of course, be impractical to allow the wishes of particular parents to be controlling. Yet the interest of the parent in the enhanced parent-school and parent-child communication allowed by the neighborhood unit ought not to be suppressed by force of law.

In the commendable national concern for alleviating public school segregation, courts may have overlooked the fact that the rights and interests of children affected by a desegregation program also are entitled to consideration. Any child, white or black, who is compelled to leave his neighborhood and spend significant time each

day being transported to a distant school suffers an impairment of his liberty and his privacy. Not long ago, James B. Conant wrote that "[a]t the elementary school level the issue seems clear. To send young children day after day to distant schools by bus seems out of the question." [27] A community may well conclude that the portion of a child's day spent on a bus might be used more creatively in a classroom, playground, or in some other extracurricular school activity. Decisions such as these, affecting the quality of a child's daily life, should not lightly be held constitutionally errant.

Up to this point I have focused mainly on the personal interests of parents and children which a community may believe to be best protected by a neighborhood system of schools. But broader considerations lead me to question just as seriously any remedial requirement of extensive student transportation solely to further integration. Any such requirement is certain to fall disproportionately on the school districts of our country, depending on their degree of urbanization, financial resources, and their racial composition. Some districts with little or no biracial population will experience little or no educational disruption, while others, notably in large, biracial metropolitan areas, must at considerable expense undertake extensive transportation to achieve the type of integration frequently being ordered by district courts.[28] At a time when public education generally is suffering serious financial malnutrition, the economic burdens of such transportation can be severe, requiring both initial capital outlays and annual operating costs in the millions of dollars.[29] And while constitutional requirements have

[27] Slums and Suburbs 29 (1961).

[28] See n. 21, *supra.*

[29] In Memphis, for example, which has no history of busing students, the minimum transportation plan ordered by the courts will require, in the School Board's estimate, an initial capital expenditure

often occasioned uneven burdens, never have they touched so sensitive a matter as wide differences in the compulsory transportation requirements for literally hundreds of thousands of school children.

The argument for student transportation also overlooks the fact that the remedy exceeds that which may be necessary to redress the constitutional evil. Let us use Denver as an example. The Denver School Board, by its action and nonaction, may be legally responsible for some of the segregation that exists. But if one assumes a maximum discharge of constitutional duty by the Denver Board over the past decades, the fundamental problem of residential segregation would persist.[30] It is, indeed, a novel application of equitable power—not to mention a dubious extension of constitutional doctrine— to require so much greater a degree of forced school integration than would have resulted from purely natural and neutral nonstate causes.

The compulsory transportation of students carries a further infirmity as a constitutional remedy. With most constitutional violations, the major burden of remedial action falls on offending state officials. Public officials who act to infringe personal rights of speech, voting, or religious exercise, for example, are obliged to cease the offending act or practice and, where necessary, institute corrective measures. It is they who bear the brunt of remedial action, though other citizens will to varying de-

of $1,664,192 for buses plus an annual operating cost of $629,192. The Board estimates that a more extensive transportation program to be considered by the district court will require initial capital investments of $3,924,000 and annual operating costs of $1,783,490. The most drastic transportation plan before the district court requires estimated annual operating costs of from $2,354,220, $2,431,710, or $3,463,100 depending on the Board's transportation arrangements. *Northcross* v. *Board of Education of Memphis City Schools*, 466 F. 2d, at 898 (Weick, J., dissenting).

[30] See n. 9, *supra.*

grees feel its effects. School authorities responsible for segregation must, at the very minimum, discontinue segregative acts. But when the obligation further extends to the transportation of students, the full burden of the affirmative remedial action is borne by children and parents who did not participate in any constitutional violation.

Finally, courts in requiring so far-reaching a remedy as student transportation solely to maximize integration, risk setting in motion unpredictable and unmanageable social consequences. No one can estimate the extent to which dismantling neighborhood education will hasten an exodus to private schools, leaving public school systems the preserve of the disadvantaged of both races. Or guess how much impetus such dismantlement gives the movement from inner city to suburb, and the further geographical separation of the races. Nor do we know to what degree this remedy may cause deterioration of community and parental support of public schools, or divert attention from the paramount goal of quality in education to a perennially divisive debate over who is to be transported where.

The problem addressed in this opinion has perplexed courts, school officials, other public authorities, and students of public education for nearly two decades. The problem, especially since it has focused on the "busing issue," has profoundly disquieted the public wherever extensive transportation has been ordered. I make no pretense of knowing the best answers. Yet, the issue in this and like cases comes to this Court as one of constitutional law. As to this issue, I have no doubt whatever. There is nothing in the Constitution, its history, or—until recently—in the jurisprudence of this Court that mandates the employment of forced transportation of young and teenage children to achieve a single interest,

as important as that interest may be. We have strayed, quite far as I view it, from the rationale of *Brown I* and *II*, as reiterated in *Swann*, that courts in fashioning remedies must be "guided by equitable principles" which include the "adjusting and reconciling [of] public and private needs," *Brown II*, 349 U. S., at 300.

I urge a return to this rationale. This would result, as emphasized above, in no prohibition on court-ordered student transportation in furtherance of desegregation. But it would require that the legitimate community interests in neighborhood school systems be accorded far greater respect. In the balancing of interests so appropriate to a fair and just equitable decree, transportation orders should be applied with special caution to any proposal as disruptive of family life and interests— and ultimately of education itself—as extensive transportation of elementary-age children solely for desegregation purposes. As a minimum, this Court should not require school boards to engage in the unnecessary transportation away from their neighborhoods of elementary-age children.[31] It is at this age level that neighborhood education performs its most vital role. It is with respect to children of tender years that the greatest concern exists for their physical and psychological health. It is also here, at the elementary school,

---

[31] There may well be advantages in commencing the integrative experiences at an early age, as young children may be less likely than older children and adults to develop an inhibiting racial consciousness. These advantages should be considered as school boards make the various decisions with the view to achieving and preserving an integrated school system. *Supra*, at 226–227. But in the balancing of all relevant interests, the advantages of an early integrative experience must, and in all fairness should, be weighed against other relevant advantages and disadvantages and in light of the demographic characteristics of the particular community.

that the rights of parents and children are most sharply implicated.[32]

IV

The existing state of law has failed to shed light and provide guidance on the two issues addressed in this opinion: (i) whether a constitutional rule of uniform, national application should be adopted with respect to our national problem of school desegregation and (ii), if so, whether the ambiguities of *Swann*, construed to date almost uniformly in favor of extensive transportation, should be redefined to restore a more viable balance among the various interests which are involved. With all deference, it seems to me that the Court today has addressed neither of these issues in a way that will afford adequate guidance to the courts below in this case or lead to a rational, coherent national policy.

The Court has chosen, rather, to adhere to the *de facto/ de jure* distinction under circumstances, and upon a rationale, which can only lead to increased and inconclusive litigation, and—especially regrettable—to deferment of a nationally consistent judicial position on this subject. There is, of course, state action in every school district in the land. The public schools always have been funded and operated by States and their local subdivisions. It is true that segregated schools, even in the cities of the South, are in large part the product of social and economic factors—and the resulting residential patterns. But there is also not a school district in the United States, with any significant minority school population, in which the school authorities—in one way or the other—have not contributed in some

---

[32] While greater transportation of secondary school students might be permitted, even at this level the desire of a community for racially neutral neighborhood schools should command judicial respect. It would ultimately be wisest, where there is no absence of good faith, to permit affected communities to decide this delicate issue of student transportation on their own.

measure to the degree of segregation which still prevails. Instead of recognizing the reality of similar, multiple segregative causes in school districts throughout the country, the Court persists in a distinction whose duality operates unfairly on local communities in one section of the country and on minority children in the others.

The second issue relates to the ambiguities of *Swann* and the judicial disregard of legitimate community and individual interests in framing equitable decrees. In the absence of a more flexible and reasonable standard than that imposed by district courts after *Swann,* the desegregation which will now be decreed in Denver and other major cities may well involve even more extensive transportation than has been witnessed up to this time.

It is well to remember that the course we are running is a long one and the goal sought in the end—so often overlooked—is the best possible educational opportunity for all children. Communities deserve the freedom and the incentive to turn their attention and energies to this goal of quality education, free from protracted and debilitating battles over court-ordered student transportation. The single most disruptive element in education today is the widespread use of compulsory transportation, especially at elementary grade levels. This has risked distracting and diverting attention from basic educational ends, dividing and embittering communities, and exacerbating, rather than ameliorating, interracial friction and misunderstanding. It is time to return to a more balanced evaluation of the recognized interests of our society in achieving desegregation with other educational and societal interests a community may legitimately assert. This will help assure that integrated school systems will be established and maintained by rational action, will be better understood and supported by parents and children of both races, and will promote the enduring qualities of an integrated society so essential to its genuine success.

Mr. Justice Rehnquist, dissenting.

I

The Court notes at the outset of its opinion the differences between the claims made by the plaintiffs in this case and the classical *"de jure"* type of claims made by plaintiffs in cases such as *Brown* v. *Board of Education,* 347 U. S. 483 (1954), and its progeny. I think the similarities and differences, not only in the claims, but in the nature of the constitutional violation, deserve somewhat more attention than the Court gives them.

In *Brown,* the Court held unconstitutional statutes then prevalent in Southern and border States mandating that Negro children and white children attend separate schools. Under such a statute, of course, every child in the school system is segregated by race, and there is no racial mixing whatever in the population of any particular school.

It is conceded that the State of Colorado and the city of Denver have never had a statute or ordinance of that description. The claim made by these plaintiffs, as described in the Court's opinion, is that the School Board by "use of various techniques such as the manipulation of student attendance zones, schoolsite selection and a neighborhood school policy" took race into account in making school assignments in such a way as to lessen that mixing of races which would have resulted from a racially neutral policy of school assignment. If such claims are proved, those minority students who as a result of such manipulative techniques are forced to attend schools other than those that they would have attended had attendance zones been neutrally drawn are undoubtedly deprived of their constitutional right to equal protection of the laws just as surely as were the plaintiffs in *Brown* v. *Board of Education* by the statutorily required segregation in that case. But the fact that invid-

ious racial discrimination is prohibited by the Constitution in the North as well as the South must not be allowed to obscure the equally important fact that the consequences of manipulative drawing of attendance zones in a school district the size of Denver does not necessarily result in denial of equal protection to all minority students within that district. There are significant differences between the proof which would support a claim such as that alleged by plaintiffs in this case, and the total segregation required by statute which existed in *Brown*.

The Court's opinion obscures these factual differences between the situation shown by the record to have existed in Denver and the situations dealt with in earlier school desegregation opinions of the Court. The Court states, *ante,* at 200, that "[w]e have never suggested that plaintiffs in school desegregation cases must bear the burden of proving the elements of *de jure* segregation as to each and every school or each and every student within the school system. Rather, we have held that where plaintiffs prove that a current condition of segregated schooling exists within a school district where a dual system was compelled or authorized by statute at the time of our decision in *Brown* v. *Board of Education,* 347 U. S. 483 (1954) (*Brown I*), the State automatically assumes an affirmative duty 'to effectuate a transition to a racially nondiscriminatory school system,' *Brown* v. *Board of Education,* 349 U. S. 294, 301 (1955) (*Brown II*) . . . ."

That statement is, of course, correct in the *Brown* context, but in the *Brown* cases and later ones that have come before the Court the situation which had invariably obtained at one time was a "dual" school system mandated by law, by a law which prohibited Negroes and whites from attending the same schools. Since under *Brown* such a law deprived each Negro child of the equal protection of the laws, there was no need to prove "the

elements of *de jure* segregation as to each and every school," since the law itself had required just that sort of segregation.

But in a school district the size of Denver's, it is quite conceivable that the School Board might have engaged in the racial gerrymandering of the attendance boundary between two particular schools in order to keep one largely Negro and Hispano, and the other largely Anglo, as the District Court found to have been the fact in this case. Such action would have deprived affected minority students who were the victims of such gerrymandering of their constitutional right to equal protection of the laws. But if the school board had been evenhanded in its drawing of the attendance lines for other schools in the district, minority students required to attend other schools within the district would have suffered no such deprivation. It certainly would not reflect normal English usage to describe the entire district as "segregated" on such a state of facts, and it would be a quite unprecedented application of principles of equitable relief to determine that if the gerrymandering of one attendance zone were proved, particular racial mixtures could be required by a federal district court for every school in the district.

It is quite possible, of course, that a school district purporting to adopt racially neutral boundary zones might, with respect to every such zone, invidiously discriminate against minorities, so as to produce substantially the same result as was produced by the statutorily decreed segregation involved in *Brown*. If that were the case, the consequences would necessarily have to be the same as were the consequences in *Brown*. But, in the absence of a statute requiring segregation, there must necessarily be the sort of factual inquiry which was unnecessary in those jurisdictions where racial mixing in the schools was forbidden by law.

Underlying the Court's entire opinion is its apparent thesis that a district judge is at least permitted to find that if a single attendance zone between two individual schools in the large metropolitan district is found by him to have been "gerrymandered," the school district is guilty of operating a "dual" school system, and is apparently a candidate for what is in practice a federal receivership. Not only the language of the Court in the opinion, but its reliance on the case of *Green* v. *County School Board,* 391 U. S. 430, 437–438 (1968), indicates that such would be the case. It would therefore presumably be open to the District Court to require, *inter alia,* that pupils be transported great distances throughout the district to and from schools whose attendance zones have not been gerrymandered. Yet, unless the Equal Protection Clause of the Fourteenth Amendment now be held to embody a principle of "taint," found in some primitive legal systems but discarded centuries ago in ours, such a result can only be described as the product of judicial fiat.

*Green, supra,* represented a marked extension of the principles of *Brown* v. *Board of Education, supra.* The Court in *Green* said:

> "It is of course true that for the time immediately after *Brown II* [349 U. S. 294] the concern was with making an initial break in a long-established pattern of excluding Negro children from schools attended by white children. . . . Under *Brown II* that immediate goal was only the first step, however. The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about . . . ." 391 U. S., at 435–436. *Brown II* was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise

which would require time and flexibility for a successful resolution. School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Id.*, at 437–438.

The drastic extension of *Brown* which *Green* represented was barely, if at all, explicated in the latter opinion. To require that a genuinely "dual" system be disestablished, in the sense that the assignment of a child to a particular school is not made to depend on his race, is one thing. To require that school boards affirmatively undertake to achieve racial mixing in schools where such mixing is not achieved in sufficient degree by neutrally drawn boundary lines is quite obviously something else.

The Court's own language in *Green* makes it unmistakably clear that this significant extension of *Brown's* prohibition against discrimination, and the conversion of that prohibition into an affirmative duty to integrate, was made in the context of a school system which had for a number of years rigidly excluded Negroes from attending the same schools as were attended by whites. Whatever may be the soundness of that decision in the context of a genuinely "dual" school system, where segregation of the races had once been mandated by law, I can see no constitutional justification for it in a situation such as that which the record shows to have obtained in Denver.

## II

The Court's opinion gives lip service to the notion that the inquiry as to whether or not the Denver school district was "segregated" is a factual one, though it refers

in various critical language to the District Court's refusal to find that minority concentration in the core area schools was the result of discriminatory action on the part of the school board. The District Court is said to have "fractionated" the district, *ante,* at 193, and to have "held that its finding of intentional segregation in Park Hill was not in any sense material to the question of segregative intent in other areas of the city," *ibid.* It is difficult to know what the Court means by the first of these references, and even more difficult to justify the second in the light of the District Court's opinion.

If by "fractionating" the district, the Court means that the District Court treated together events that occurred during the same time period, and that it treated those events separately from events that occurred during another time span, this is undoubtedly correct. This is the approach followed by most experienced and careful finders of fact.

In commencing that part of its comprehensive opinion which dealt with the "core area" schools, the District Court observed:

> "The evidentiary as well as the legal approach to the remaining schools is quite different from that which has been outlined above. *For one thing, the concentrations of minorities occurred at an earlier date* and, in some instances, prior to the *Brown* decision by the Supreme Court. Community attitudes were different, including the attitudes of the School Board members. *Furthermore, the transitions were much more gradual and less perceptible than they were in the Park Hill schools.*" 313 F. Supp. 61, 69. (Emphasis supplied.)

The District Court noted, in its opinion of July 31, 1969, the differentiation that the plaintiffs themselves had made between the so-called "Park Hill" schools and

the "core area" schools. The plaintiffs had sought a preliminary injunction prohibiting the school board from rescinding three resolutions which had been adopted by a differently composed school board earlier in 1969 and which would have redrawn school boundary lines in the Park Hill area to achieve greater integration. In its opinion granting that injunction, the District Court said:

"Attention at this hearing has focused primarily on the schools in northeast Denver, and particularly on the area which is commonly called Park Hill. The alleged segregated schools, elementary and junior high schools in this area, have acquired their character as such during the past ten years. The primary reason for this has been the migration of the Negro community eastward from a confined community surrounding what is commonly called 'Five Points.' Before 1950 the Negroes all lived in a community bounded roughly by 20th Avenue on the south, 20th Street on the west, York Street on the east, and 38th Avenue on the north. The schools in this area were, and are now, largely Negro schools. However, we are not presently concerned with the validity of this condition. During this period the Negro population was relatively small, and this condition had developed over a long period of time. However, by 1960 and, indeed, at the present time this population is sizeable. As the population has expanded the move has been to the east, first to Colorado Boulevard, a natural dividing line, and later beyond Colorado Boulevard, but within a narrow corridor—more or less fixed north-south boundaries. The migration caused these areas to become substantially Negro and segregated." 303 F. Supp. 279, 282.

Further reference to the District Court's several opin-

ions shows that the allegedly discriminatory acts of the School Board in the Park Hill area occurred between 1960 and 1969, in the context of a steadily expanding Negro school population in the Park Hill area and heightened sensitivity on the part of the community to the problems raised by integration and segregation.

The allegedly discriminatory acts with respect to the "core area" schools—New Manual High School, Cole Junior High School, Morey Junior High School, and Boulevard and Columbine Elementary Schools—took place between the years 1952 and 1961. They took place, as indicated by the references to the District Court's opinion noted above, not in a context of a rapidly expanding Negro population, but in a context of a relatively fixed area of the city that had for an indefinite period of time been predominantly Negro.

Thus, quite contrary to the intimation of virtual arbitrariness contained in the Court's opinion, the District Court's separate treatment of the claims respecting these two separate areas was absolutely necessary if a careful factual determination, rather than a jumbled hash of unrelated events, was to emerge from the fact-finding process. The "intent" with which a public body performs an official act is difficult enough to ascertain under the most favorable circumstances. See *Palmer* v. *Thompson,* 403 U. S. 217 (1971); *McGinnis* v. *Royster,* 410 U. S. 263 (1973). Far greater difficulty is encountered if we are to assess the intentions with which official acts of a school board are performed over a period of years. Not only does the board consist of a number of members, but the membership customarily turns over as a result of frequent periodic elections. Indeed, it was as a result of the 1969 election for membership on the Denver School Board that the Board's policy which had previously favored the correction of racial imbalance by

implementation of resolutions was reversed by the election of new members to the Board.

These difficulties obviously do not mean that the inquiry must be abandoned, but they do suggest that the care with which the District Court conducted it in this case is an absolutely essential ingredient to its successful conclusion.

The Court's bald statement that the District Court "held that its finding of intentional segregation in Park Hill was not in any sense material to the question of segregative intent in other areas of the city" is flatly belied by the following statement in the District Court's opinion:

> "Although past discriminatory acts may not be a substantial factor contributing to present segregation, they may nevertheless be probative on the issue of the segregative purpose of other discriminatory acts which are in fact a substantial factor in causing a present segregated situation." 313 F. Supp., at 74–75, n. 18.

Thus, it is apparent that the District Court was fully aware that it might take into consideration the intention with which it found the School Board to have performed one act in assessing its intention in performing another act. This is the most that the references in the Court's opinion to evidentiary treatises such as Wigmore and McCormick support. And it should be noted that the cases cited by the Court, and by the authors of the treatises, almost invariably deal with the intention of a particular individual or individuals, and not with the "intention" of a public body whose membership is constantly changing.

The Court's opinion totally confuses the concept of a permissible inference in such a situation, of which the District Court indicated it was well aware, with what

the Court calls a "presumption," which apparently "shifts . . . the burden of proving" to the defendant school authority. No case from this Court has ever gone further in this area than to suggest that a finding of intent in one factual situation may support a finding of fact in another related factual situation involving the same factor, a principle with which, as indicated above, the District Court was thoroughly familiar.

The District Court cases cited by the Court represent almost entirely the opinions of judges who were themselves finders of fact, concluding as a part of the fact-finding process that intent with respect to one act may support a conclusion of a like intent with respect to another. This is but a restatement of the principle of which the District Court showed it was aware. And, obviously, opinions of courts of appeals upholding such findings of the District Court do not themselves support any broader proposition than do the opinions of the District Court in question.

*Chambers* v. *Hendersonville City Board of Education,* 364 F. 2d 189 (CA4 1966), and *North Carolina Teachers Assn.* v. *Asheboro City Board of Education,* 393 F. 2d 736 (CA4 1968), involved a background of segregation by a law in the State of North Carolina and "the failure of the public school system to desegregate in compliance with the mandate of *Brown* until forced to do so by litigation." 364 F. 2d, at 192. The courts held that the decimation in the ranks of the Negro teachers while white teachers were unaffected, raised an inference of discrimination which cast upon the school board the burden of justifying such decimation. In each case, the school board had offered virtually no evidence supporting any nondiscriminatory basis for the result reached. The cases are thus wholly different in their factual background from the case now before the Court.

Also worthy of note is the fact that neither in *Chambers* nor in *Asheboro* did the Court of Appeals remand for a further hearing, but in effect ordered judgments for the appellants on the issues considered. This amounted to a determination that the factual finding of the District Court on that issue was "clearly erroneous," and the statement as to presumption was a statement as to the appellate court's method of evaluating the factual finding. This Court is in quite a different position in reviewing this case, with the factual finding of the District Court having been affirmed by the Court of Appeals for the Tenth Circuit, than was the Court of Appeals for the Fourth Circuit in reviewing the factual findings of the District Courts that were before it in *Chambers* and in *Asheboro*. Indeed, it would be contrary to settled principles for this Court to upset a factual finding sustained by the Court of Appeals. "A seasoned and wise rule of this Court makes concurrent findings of two courts below final here in the absence of very exceptional showing of error." *Comstock* v. *Group of Institutional Investors*, 335 U. S. 211, 214 (1948).

The Court, doubtless realizing the difficulty of justifying an outright reversal, instead remands for further factual determination under newly enunciated standards governing the evidentiary treatment of the finding as to Park Hill by the District Court. These standards call in some parts of the opinion for establishing a presumption, in other parts for shifting the burden of proof, and in other parts for recognizing a prima facie case. Quite apart from my disagreement with the majority on its constitutional law, I cannot believe it is a service to any of the parties to this litigation to require further factual determination under such a vague and imprecise mandate. But, more fundamentally, I believe that a District Judge thoroughly sympathetic to the plaintiffs' claims gave them the full evidentiary hearing to which

they were entitled and carefully considered all of the evidence before him. He showed full awareness of the evidentiary principle that he might infer from the "segregative intent" with which he found the Board to have acted in the Park Hill area a like intent with respect to the core area, but he deliberately declined to do so. This was his prerogative as the finder of fact, and his conclusion upon its affirmance by the Court of Appeals is binding upon us.

### III

The Court has taken a long leap in this area of constitutional law in equating the district-wide consequences of gerrymandering individual attendance zones in a district where separation of the races was never required by law with statutes or ordinances in other jurisdictions which did so require. It then adds to this potpourri a confusing enunciation of evidentiary rules in order to make it more likely that the trial court will on remand reach the result which the Court apparently wants it to reach. Since I believe neither of these steps is justified by prior decisions of this Court, I dissent.