NORTHSIDE INDEPENDENT SCHOOL DISTRICT OF BEXAR ET AL., COUNTIES, TEXAS, et al.

v.

TEXAS EDUCATION AGENCY and Marlin L. Brockette, Commissioner of Education of the State of Texas.

Civ. A. No. SA75CA235.

United States District Court,
W. D. Texas,
San Antonio Division.

Jan. 5, 1976.

Memorandum Opinion Jan. 15, 1976.

Clemens, Weiss, Spencer & Welmaker, George H. Spencer, Dobbins, Howard & Harris, William P. Dobbins, San Antonio, Tex., for plaintiffs.

John L. Hill, Atty. Gen., & Roland Allen, Asst. Atty. Gen., Austin, Tex., for defendants.

Mexican-American Legal Defense & Ed. Fund, George J. Korbel, San Antonio, Tex., for amici curiae.

## ORDER GRANTING PERMANENT INJUNCTION

SPEARS, Chief Judge.

On this the 5th day of January, 1976, came on for consideration plaintiffs' application for a permanent injunction; and the Court having again fully considered the pleadings, evidence, arguments and briefs submitted prior to and during the consolidated hearing held on October 31, 1975 and November 3, 1975, as well as the briefs of the parties and amici curiae filed subsequent to said hearing, is of the opinion, and so finds; that:

(1) Although amici curiae has alleged in general terms certain areas in which they claim that the Texas Education Agency has failed to adequately defend the issue of segregatory intent on the part of local school officials, they have at no time during the course of this litigation, from the date the lawsuit was filed on September 19, 1975 until the present time, stated with any degree of specificity what evidence they could produce to support their assertions. Nevertheless, despite the failure of amici curiae to demonstrate a legal right to intervene, but believing that their counsel were acting in a good faith effort to assist in maintaining and preserving the due administration of justice, this Court entered an order on December 16, 1975 reopening the case "for the limited purpose of allowing further discovery by amici curiae and/or the parties hereto with respect to the ultimate issue of segregatory intent". To afford amici curiae an opportunity to prove their allegations of inadequate representation by the Texas Education Agency, they were authorized by said order, for a period of sixty (60) days from January 1, 1976, "to conduct discovery procedures as either of the parties is permitted to do under the Federal Rules of Civil Procedure, including, but not limited to, the calling of witnesses, whether they have previously testified or not, for questioning by oral deposition or written interrogatories." Clearly, therefore, in conducting such discovery procedures amici curiae had the imprimatur of this Court, and it is implicit in the authority granted that the Court could not only have taxed as costs the expenses incurred incident to the authority granted, but it could also have given them compensation for services rendered. By the same token, it would be illogical to assume that a Court granting such powers to amici curiae would be so callous as to deny to them the right of appeal from an adverse decision, in the unlikely event that an appeal was not taken by one of the parties. However, instead of informing the Court and counsel not later than December 31, 1975 "concerning the areas of discovery they expected to pursue, and identifying to the fullest extent possible, the witnesses they expected to depose, and any further evidence they proposed to develop", as they were directed to do by the Court, amici curiae chose to refuse to make the slightest effort to comply with the Court's order. On the contrary, their response, in letter form, promised "an outline of the areas which would form the formal action of a complete discovery of this case", only in return for the right to participate "as parties in the litigation", a position vastly different from that reasonably to be expected from those who had offered their services as "friends of the Court". Their conduct, therefore, justifies the conclu-

sion, reluctantly reached, that they knew full well that they could neither satisfy the legal requirements for intervening as parties to the lawsuit, nor support with competent evidence the allegations of incompetency and inadequacy repeatedly made by them, which, under the circumstances, could serve no purpose other than to raise the specter of suspicion, thereby casting doubt upon the validity of the record made in this case.

(2) In view of the lapse of fifteen (15) weeks, during which time there has been no evidence of any nature produced to refute the showing made by the Northside Independent School District to the effect that no segregatory intent on its part caused or contributed to the racial imbalance of the schools in question, this Court is left with the distinct and inescapable feeling that there is not now, nor has there ever been, any such evidence in existence, the importunities of amici curiae to the contrary notwithstanding. In this connection, the failure and refusal of counsel for amici curiae to exhibit basic good faith in fulfilling their obligations and responsibilities to this Court, combined with their unfortunate attempt to force an unwarranted ruling with respect to their motion to intervene, are completely indefensible, and wholly unacceptable to this Court, and constitute a forfeiture of any further right or privilege on their part to participate in this lawsuit in any capacity whatsoever, and the Clerk of this Court is directed to act accordingly.

(3) Since no useful purpose can be served by holding any further hearing, none will be held.

(4) There being no evidence of segregatory intent on the part of the Plaintiff School District, or the members of its Board of Trustees, or its administrative staff which has caused or contributed to the racial imbalance of the schools in question, it is, therefore,

ORDERED, ADJUDGED and DECREED that the defendants, Texas Education Agency and Marlin L. Brockette, Commissioner of Education of the State of Texas, their respective officials, agents and representatives, be and they are hereby permanently enjoined from suspending the accreditation of the Northside Independent School District of Bexar, Medina and Bandera Counties, Texas, and from suspending payments to the said Northside Independent School District of any State funds granted to said School District under the Minimum Foundation Program.

(5) Plaintiffs' motion for a determination that this cause may be prosecuted as a class action is hereby granted, and a separate order to that effect is entered coincident herewith.

(6) All costs herein are assessed against the defendants.

(7) All relief requested which is not granted in whole or in part by this final judgment is hereby denied.

(8) The Court reserves the right to later file a written opinion more fully stating its views herein.

## MEMORANDUM OPINION

■ An order permanently enjoining the defendants from suspending the accreditation of the Northside Independent School District, and from suspending payments of state funds granted to said school district under the Minimum Foundation Program, was entered on the 5th day of January, 1976. This opinion, containing findings of fact and conclusions of law in support thereof, is filed pursuant to Rule 52(a), F.R.Civ.P.

The record herein reflects that on July 17, 1975, the Texas Education Agency (TEA) wrote a letter addressed to the Board of School Trustees of Northside Independent School District (Northside ISD) to the effect that in the opinion of the TEA the Esparza and Forest Hills Elementary Schools, the Linton Kindergarten and the Sul Ross Middle School, each with an enrollment of more than sixty-six (66%) per cent minority students, constituted for that reason a violation of the modified court order of the United States District Court, Eastern District of Texas, Tyler Division, in Civil Action No. 5281, pending in said Court,

particularly with reference to subsection 3 of Section F of said order. In said letter, the TEA further advised that in accordance with the provisions of the Court's order it was offering a plan to eliminate the racial imbalance in the schools in question. This plan involved the "pairing" of certain schools with the resulting busing of substantial numbers of elementary school children, as hereinafter described in more detail. The letter pointed out, however, that the Superintendent of the District had already approved the boundary change for the Sul Ross Middle School which was recommended in the report. The report further pointed out that the proposed boundary change would bring 32 new students into the Sul Ross Middle School, of which only four were minority students; that the addition of these students would bring the total minority enrollment at Sul Ross to 65.7%; and that it would, therefore, not be necessary that the TEA recommend the elimination of the Sul Ross campus as an identifiable school at that time. The report itself also dealt with Cable Elementary School, which was not mentioned in the letter, and provided that Cable should be paired with Meadow Village Elementary School. When the omission of Cable Elementary School from the body of the letter was called to the attention of TEA by the School District, it was corrected by an addendum.

Upon receipt of the warning letter the Plaintiff School District closed the Linton Kindergarten and transferred the students who had been enrolled there to the Thunderbird Hills Elementary School, which houses kindergarten through the fifth grade classes, because the housing of the kindergarten children from Forest Hills and Esparza at Linton was a temporary measure due to overcrowding at the first two schools, and the District had no more objection to providing such housing at Thunderbird than at Linton.

The School District refused to comply with the other requirements of the warning letter of July 17, 1975, claiming that the requirements were educationally unsound; that there was, in fact, no discrimination on the part of the School District against any of its students because of their race, color, ethnic background or national origin; and that any racial or ethnic imbalance in the three schools in question was brought about solely by demographic changes.

The warning letter issued by the TEA threatened loss of accreditation and State Foundation funds unless the racial imbalance was eliminated by November 24, 1975.

The District, joined by certain individual Plaintiffs suing by themselves and on behalf of the class or classes which they claim to represent, brought this suit seeking declaratory and injunctive relief.

Plaintiffs' position is that the controlling issue is whether the existing racial imbalance in the three schools is the result of segregatory intent on the part of the local school officials. The Defendants have consistently contended that segregatory intent is not a necessary prerequisite to a finding that the School District is in violation of the order of the Tyler Court in Civil Action No. 5281, dated April 29, 1971, which the Defendants construed as requiring the issuance of the warning letter.

The order of the Tyler Court, dated April 20, 1971, required the Defendants to "review each year all school districts in the state in which there exist schools enrolling more than 66% minority group students . . . and . . . *make findings as to whether or not the student assignment plans of those districts have resulted in compliance with constitutional standards.*" While this language was altered to some extent in an amended order, dated August 9, 1973, it could not reasonably have been intended to provide that a mere statistical analysis of racial identification was sufficient to constitute a violation of constitutional rights, because if it had done so, it would have run afoul of the Supreme Court pronouncement in *Swann v. Charlotte-Mecklenburg Board of Education,* 402

U.S. 1 at page 24, 91 S.Ct. 1267 at page 1280, 28 L.Ed.2d 554 at page 571 (1971), where it was said: "If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse."

That segregatory intent is an essential element to a finding of unconstitutional segregation was made explicit by the Supreme Court in *Keyes v. School District,* 413 U.S. 189 at 208, 93 S.Ct. 2686 at 2697, 37 L.Ed.2d 548 at 563 (1973), in the following language: "We emphasize that the differentiating factor between *de jure* segregation and so-called *de facto* segregation to which we referred in *Swann* is *purpose* or *intent* to segregate."

The Fifth Circuit has itself acknowledged the fact that *Keyes* reversed its prior holding to the effect that cause and effect constituted a sufficient basis for desegregation of a de facto school system, and agrees that proof of segregatory intent now is an essential element to a finding of alleged segregation in such system, *Morales v. Shannon,* 516 F.2d 411 at 412–413 (1975), and *United States v. Midland I. S. D.,* 519 F.2d 60 at 63–64 (1975).

Furthermore, it seems clear that the exclusive jurisdiction to hear and determine these cases is not vested in the Tyler Court. This Court is in complete accord with *Gregory-Portland I. S. D. v. Texas Education Agency,* CA No. 73–C–175 (S.D.Tex. March 1, 1975), in which Judge Cox made it crystal clear that "(T)his court does not purport to contravene the Tyler order, but says that the Texas Education Agency has no right, under the Tyler order or any other order, to impose the sanctions it proposes without finding the existence of unconstitutional segregation . . . ."

Upon a petition for Writ of Mandamus to compel Judge Cox to transfer the case to the Tyler Court, the Fifth Circuit held such relief to be inappropriate, noting that "(T)he Southern District Court has expressly disavowed any intent to contravene the mandate . . . (and) the two cases need not inevitably be in conflict." *U. S. v. U. S. Dist. Ct.,* 506 F.2d 383 at 384 (1974).

Judge Justice, the author of the Tyler order, has himself recognized the jurisdiction of other Texas federal courts in suits of this kind when he said, in a case where a state court had attempted to prohibit the Commissioner of Education from rejecting certain transfer requests, that whether the Commissioner properly carried out the applicable section of his order "may properly be aired in a federal district court if and when such challenge is asserted." *United States v. Texas,* 356 F.Supp. 469, 472 (E.D.Tex. 1972).

In light of the foregoing it has been difficult for this Court to understand why the Texas Education Agency has persisted in refusing to perform the obligation placed upon it by the Tyler Court to make findings with respect to whether or not the student assignment plans of districts enrolling more than 66% minority group students have resulted in compliance with federal constitutional standards before it undertakes to impose sanctions, as it has done in the instant case. To ignore decisions of the Supreme Court and the Court of Appeals while, at the same time, falling back on language of the Tyler court order taken out of context, hardly constitutes a valid excuse for the failure of a responsible agency to act responsibly.

In order to fully understand the situation existing at the Northside Independent School District, it is appropriate to give a brief recitation of the facts developed at the trial.

The School District contains an area of approximately three hundred twenty-one (321) square miles in Bexar County, Texas, twenty-two (22) square miles in Medina County, Texas and seven (7) square miles in Bandera County, Texas. It lies in the Northwest quadrant of Bexar County and is traversed by U.S. Interstate Highway 10 and a portion of U.S. Interstate Highway 90 West. Culebra

Road connects with San Antonio's expressway system and Bandera Road. Loop 410, a major expressway system, surrounds San Antonio and runs through the southern and southwestern portions of the District. The school system consists of thirty-five (35) schools; three (3) high schools, six (6) junior high or middle schools, twenty-one (21) elementary schools, one (1) kindergarten and four (4) special education schools. Its total enrollment of 38,873 students consists of 8,111 Mexican-American students, 1,368 Black students, 9 native American students, 183 Oriental students and 19,202 Anglo students. When the District was created, it was largely rural in nature. The minority percentages in the School District (largely Mexican-American) for the 1966–67 school year was fifteen (15%) per cent as compared to approximately thirty (30%) per cent at the present time. Rapid population growth is toward the northern part of the District and along the eastern boundaries of the District.

The predecessor of the present Northside ISD was formed in 1949 by the consolidation of six common school districts, all situated in what was essentially a rural area, containing 350 square miles. In the 1957–58 school year, there were only 2,175 students in the original 350 square mile area. Since its formation, the Plaintiff School District has adhered to the neighborhood school plan in assigning its students and has never had a freedom of choice plan. The evidence shows that the neighborhood school plan has encouraged parent participation in their neighborhood schools, enabled parents in one car families to contact their children in school in case of emergencies and has had numerous other educationally related benefits.

From the Mexican-American's standpoint, Northside Independent School District is a de facto system, as was true in *Morales v. Shannon,* supra. The difference between this case and *Morales,* however, is that in the *Morales* case there had at one time existed a designated "Mexican school," with a 100% Mexican-American enrollment. The uncontradicted evidence in the instant case is that there was never a separate school set up for Chicanos or Mexican-Americans in any of the common school districts out of which the consolidated school district which later became Northside Independent School District was formed; and there was never a school with a 100% Mexican-American enrollment in the Plaintiff District. On the contrary, the facts show in this case that the school authorities have never been guilty of any discriminatory practices with reference to the school faculties, student activities, intra-district transfers, student assignments or transportation. The evidence is uncontradicted that there are no vestiges of any former dual school system in the District. In this connection, Black students account for only 4.7% of the total school population, and the highest percentages of these students are found in the "non-identifiable" schools. Of the three schools in question in this litigation, there is only one in which the percentage of Black students approaches the average for the District as a whole. As heretofore mentioned, there were four elementary schools and one middle school in the District which had more than 66% minority students in their student bodies at the time the Defendant made its investigation in May of 1975. The highest percentage in any of the "identifiable" schools was 87.4%. The lowest was 67.1%. Identifiable as used by the Defendants, means a school with a student body which is composed of 66% or more students from minority groups. Of these five schools one was the Linton school which was being used as a school for kindergarten children. The school was closed prior to the institution of this litigation and in line with the recommendation of the Defendants was housed in Thunderbird Hills school which had developed some excess capacity and could be used to house those children. Insofar as the middle school was concerned, the District had approved a boundary change prior to the time the report of Defendants was prepared which had promise of reducing the mi-

nority interest to less than 66%. For these reasons, the requirements of Defendants related to only three elementary schools out of the thirty-five schools (including four special schools) in the District.

One of the chief problems relating to minority imbalance facing the school authorities can be traced to the location of the School District itself. It is bordered by the predominately Mexican-American Edgewood Independent School District and the South San Antonio Independent School District. The San Antonio Independent School District, which draws 85% of its student population from minority groups, lies near, if it does not border, the area in which the Esparza, the Forest Hills and the Cable schools are located. The South San Antonio District, which today has a student population 75% of which is composed of minority students, borders on the area served by the Cable school.

All or portions of the Edgewood, San Antonio and South San Antonio Districts lie in the ever growing "West Side" of San Antonio, which has for generations been and continues to be populated by a strong percentage of Mexican-Americans. Although the main Mexican-American concentration exists in the southeastern area of the District, there is also an insignificant representation in other areas of the School District.

During the last ten years Northside Independent School District has experienced a phenomenal growth, its student population having been increasing at the rate of approximately 2,000 new students per year. The evidence reflects that at the time the three identifiable schools in issue were constructed, they were constructed in areas which were racially and ethnically mixed, although in varying degrees. However, the facts further show that in spite of the good faith efforts of the school authorities, there were several instances in which new subdivisions and even partially built subdivisions ultimately developed with fewer non-minority families than anticipated. The facts further reflect that the substantial problem of housing an average of 2,000 new students a year required constant construction of new schools, the use of temporary housing, in many cases the temporary change of attendance zones and abandonment of previously well conceived plans for orderly developed and racially balanced attendance in schools.

Forest Hills Elementary School, Esparza Elementary School and Cable Elementary School are excellent facilities, of which Cable is the oldest, having been built in the traditional concept. The other two schools were built around the open classroom concept. All three schools have bilingual and Title I programs which seem to be meeting the needs of the students.

Prior to the sending of the warning letter and the institution of this lawsuit, the TEA did not afford the District or any of the individual Plaintiffs or any of the members of the class or classes on behalf of whom they sue an opportunity to appear and present evidence or to cross-examine witnesses in connection with any alleged violation on the part of Northside ISD of the Constitution of the United States, or for the purpose of determining whether or not the District unconstitutionally discriminated against any of its students because of race, color, ethnic background or national origin.

Neither Northside ISD nor any of the individual Plaintiffs nor any member of the class or classes for the benefit of whom they sue was a party to Civil Action No. 5281 pending in the United States District Court for the Eastern District of Texas.

Other than the subject matter of the TEA's warning letter of July 17, 1975, which is at issue in this action, Northside ISD had strictly complied at all times prior to the issuance of such letter with all of the statutes of the State of Texas and rules and regulations of the TEA necessary to entitle its schools to full accreditation.

The Cable Elementary School was opened in 1958 in a largely rural area.

There were six classrooms with two minority teachers and four non-minority teachers. Prior to the construction of Cable, the children residing in the general area of the school site had attended either the Mackey Elementary School, the Leon Valley Elementary School or the Sunset Hills Elementary School.

Although there were few homes in the area at the time the site for Cable was chosen, the school authorities visualized future development and desired to establish a school in the area in order to eliminate the substantial transportation problems involved in moving the children across the Bandera Highway to the Leon Valley and Sunset Hills Schools.

The site chosen for Cable was at the western edge of a partially developed area which was largely minority in racial and ethnic composition. It was felt that there would be a substantial growth in the area west of the site which had the potential of becoming primarily a non-minority neighborhood. This area did develop as a non-minority area; and when it had so developed, the Cable school was enlarged by a six-classroom addition. The entire area above mentioned was then placed in the Cable attendance zone in 1966. Of the children transferred into the Cable attendance zone in 1966, 78% were non-minority students. However, more rapid than expected population growth developed in the areas to the east of the school site, which bordered on the Edgewood, Southwest and South San Antonio districts, all of which had seen increases in their minority student population in recent years. The extent of the rapid growth of the scholastic population in the areas east of the Cable school which developed as a primarily minority neighborhood, is evidenced by the fact that the original six-classroom school has been enlarged from time to time so as to now comprise a facility containing 21 classrooms.

From time to time subsequent changes were made in the Cable attendance zone, primarily to relieve overcrowding in the sending school, although many were made in an effort to reduce the minority composition. These changes reduced the minority composition to well below 66% for the school years beginning in 1965 and ending with 1970. After that period, the minority membership fluctuated from 67% in the 1970–71 school year to a high of 77% in the 1972–73 school year. It then dropped to 66% in the 1973–74 school year; rose to 71% in the 1974–75 school year and rose to 79% in the 1975–76 school year.

No statistics as to the ethnic composition of Cable's student body were kept until the beginning of the 1965–66 school year, but the evidence shows that when Cable was opened, it had a minority student enrollment of over 90%. Cable has never had a 100% minority student enrollment and was never designated as a school for Mexican-Americans. In fact, as pointed out, the Board's action clearly reflected its intention for this not to be the case.

As recently as the 1967–68 school year, the Sunset Hills and Thunderbird Hills Elementary schools served the area now embraced within the attendance zones of four schools; i. e., Sunset Hills, Thunderbird Hills, Forest Hills and Esparza Elementary Schools. During the 1967–68 school year, the minority students comprised only 30.1% of the total student population of 1,511 in this entire area. At the time of the trial in substantially the same area, the minority students comprised 69.6% of the total student population of 2,945. Thus, the minority representation and the total student population more than doubled throughout this large area during the eight year period.

The Forest Hills school was built primarily to serve children who were ineligible for bus transportation because they lived within walking distance of Sunset Hills (in what was to become the Forest Hills attendance zone) and had to cross or walk along the Bandera Highway, a narrow but major thoroughfare, on their way to school.

The year before Forest Hills was opened, the Board and the administrative staff made a study as to what the ethnic makeup of the new Forest Hills

school would be. The estimate was that there would be approximately an equal number of non-minority and minority children attending the Forest Hills School. This estimate was based on the fact that the real estate developer in the area had discussed his plans for development with the school authorities and had indicated that his plans were to build moderately priced homes in the area near Culebra Avenue, situated in the southeast portion of the proposed zone of the Forest Hills School and to construct much higher priced homes in the northern portion of such zone, nearer Ingram Road. The school authorities felt that this type of development would not only result in a balanced student body when the Forest Hills School was first opened but would continue to furnish a balanced student body thereafter. After the developer had constructed approximately three streets of higher priced homes in the northern portion of the subdivision in accordance with his plans and three or four streets of moderately priced homes in the southern portion of the subdivision and after the Forest Hills School had been constructed, the developer changed his plans primarily because of the passage by Congress of the 235 and 236 subsidized housing programs.

The developer then began to build 235 subsidized housing in the area, thus pulling a larger number of minorities into a rather concentrated area. The school officials immediately met with the Department of Housing and Urban Development and expressed their fears as to overcrowding which was undoubtedly going to occur in the Forest Hills School with the resulting detrimental effect on the educational program of the District. The overcrowding did occur and brought about numerous changes in the attendance zones of the Forest Hills School and the Thunderbird Hills Elementary School. In the 1968–69 school year, Forest Hills had a 48% minority representation, thus confirming the original estimate of the school authorities. In the 1969–70 school year, the ratio rose to 63%. For the next three years, it fluctu-

ated between 72% and 78%. In the 1972–73 school year, it rose to the low eighty percentile where it stood at the time of trial. Here again, however, the school was never designated as a school for Mexican-Americans. It was designed with an attendance zone which, if a completely uncontrolled event had not occurred, the school might well have had a fairly balanced ethnic student body.

The Esparza Elementary School was opened in the 1972–73 school year. Its attendance area was carved out of the Forest Hills Elementary School and the Thunderbird Hills Elementary School areas. A bond issue for this school had been voted in 1968. However, after the passage of the bond issue, the members of the Culebra Park Community Council, a minority group of civic minded people, had expressed fears that the new school might become a minority school and requested that instead of constructing the school that the children in the Culebra Park Addition continue to be transported to Thunderbird Hills School and to Forest Hills School. The school officials therefore added a new addition to Thunderbird Hills and some additions to Forest Hills in order to be able to take care of these children at these schools. In 1971, the Culebra Community Council representatives met with the school officials and expressed concern over the overcrowding in Thunderbird Hills and Forest Hills schools and over the fact that the transportation of their children to these schools was not as satisfactory as had been anticipated and asked for a neighborhood school in keeping with the neighborhood school plan which the District had uniformly pursued for over twenty years. They expressed a desire to participate in selecting a site for the new school, in establishing its attendance zones and in selecting a name for the new school. They wanted a school in very close proximity to the heart of the Culebra Park Subdivision. They, with the cooperation of the school authorities, designated an attendance zone out of the very heart of the Culebra Park Subdivision, the Breezewood Subdivision, which

**374**

was predominately (approximately 80%) non-minority and two developments in the very early stages of their growth which had not become established neighborhoods, which both the Culebra Park Council and the school authorities felt would produce substantially more non-minority residents than would be moving into the heart of the Culebra Park area itself. Esparza, when it first opened, had a 70% minority representation. Unfortunately, the Breezewood area did not continue to develop as a non-minority area as planned in spite of the higher priced homes that had been and were being constructed in Breezewood at the time it was placed in the Esparza attendance zone, nor did the other two areas develop as non-minority areas as expected. To include the Breezewood Subdivision in the proposed attendance zone of the Esparza School required that the area be transferred from Forest Hills; however this transfer was consistent with the overall attempt of the Board to house adequately the children of the District since Forest Hills was overcrowded. Nevertheless, there is strong evidence that there was no segregative intent on the part of the school Board to create a racially isolated school. This evidence is strengthened by the forthright and frank testimony by the school authorities in this case and their general nondiscriminatory treatment of minority problems throughout the District over a period of many years of frustrating, but often losing, battles against constant overcrowding in first one school and then another while being faced at the same time with a large increase in minority group students throughout the entire District.

After having carefully considered the pleadings, evidence, arguments and briefs submitted, this Court is of the opinion, and so finds and declares from the overwhelming preponderance of the evidence, that there was no segregatory intent on the part of any of the school officials which has caused or contributed to the racial imbalance of the schools in question; that the Northside Indepen-

dent School District has engaged in no conduct violative of any rights guaranteed to residents of the district under the Constitution and laws of the United States; and that no such conduct exists therein.